# Richmond.

## CRUMP v. THE COMMONWEALTH.

### MAY 24th, 1888.

Absent, Richardson and Hinton, J J.

1. CRIMINAL PROCEEDINGS—"*Boycotting.*"—The essential idea of "boycotting" is a confederation, generally secret, of many persons whose intent is to injure another, by preventing any and all persons from doing business with him through fear of incurring the displeasure, persecution and vengeance of the conspirators.

2. IDEM—*Indictment.*—Indictment charging a criminal conspiracy and alleging that defendant and others did unlawfully and maliciously, &c., conspire, &c., to injure, &c., certain persons in their business by unlawfully, &c., making threats to a great number of their customers, and that by said threats and unlawful acts the business of such persons was greatly injured, is sufficient; the particular means employed need not be alleged.

3. IDEM—*Evidence—Case at bar.*—At trial of indictment for conspiracy "to boycott," the evidence (see opinion) *held,* sufficient to warrant the verdict of guilty.

4. IDEM—*Instructions.*—At trial for criminal conspiracy an instruction is proper that "if the jury believe from the evidence that defendant agreed with one or more to coerce B. to discharge, against B.'s will, certain of his employees, and to employ certain others whom B. did not wish to employ, that such agreement is unlawful; and that if in pursuance of such agreement defendant threatened any of B.'s customers, they, (the defendant and others), would injure the business of such customers by intimidating their customers, and making them afraid to continue their patronage of the customers of B., then the jury must find the defendant guilty.

Error to judgment of hustings court of city of Richmond, rendered May 27th, 1887, on an indictment against W. F.

Crump for a criminal conspiracy with others "to boycott" Baughman Brothers. The jury found a verdict of guilty, which the defendant moved the court to set aside. But the court overruled the motion. During the trial the defendant asked the court to give to the jury certain instructions which the court refused, and gave an instruction asked for by the Commonwealth against the defendant's objection. To the rulings the defendant excepted, and the evidence being certified, brought the case here on error. The instructions asked for by the defendant are as follows:

"1. The court instructs the jury that if they believe from the evidence that the Typographical Union, No. 90, was, at the time of the alleged conspiracy, and had been for eighteen or twenty years previous, an association of printers formed for the purposes set forth in the preamble of their constitution, and that they authorized the defendants, Crump, Wilde, and Shelton to try to get the printing offices in the city to agree to employ only persons who were then or should afterwards become members of said union, and, in case of failing to get any one of said offices to so agree, to notify said office that the members of said union would thereafter refuse to deal with said office, and would try to persuade their friends to so refuse also, and to refuse to deal with any one who should continue to deal thereafter with said office, and that the said Wilde, Shelton, and Crump attempted to persuade Baughman Brothers to so agree, but were refused by said Baughman Brothers, and afterwards notified their friends of such refusal and the patrons of said Baughman Brothers that the said union would not hereafter, until the trouble with said Baughman Brothers was settled, deal with said Baughman Brothers or any persons dealing with them, and would try to get all their friends to act likewise, and in said endeavor used no force, violence, threat, or personal intimidation against either Baughman Brothers or their patrons, then they must find the prisoner not guilty.

"2. A person has a right to notify the public or any number of persons of his intention to do a thing, if he has a lawful right to do the thing itself. Two or more persons have a right to notify the public that they have agreed to do a certain thing, if they have the right to agree to do the thing itself.

"3. A person has the right to notify the public that he will not deal with a certain person or any other person dealing with that person, unless the reason given be slander or libel. Two or more persons have the right to agree to notify the public that they will not deal with a certain person or any other person dealing with that person, unless the reason given be slander or libel.

"4. In law, a threat is a declaration of an intention or determination to injure another by the commission of some unlawful act, and an intimidation is the act of making one timid or fearful of such declaration. But the announcement of an intention by several persons to do a thing which they have the right to do, either singly or together, cannot be a threat or an intimidation. And if the jury believe that the alleged conspirators confined themselves to merely announcing to the patrons of Baughman Brothers that they had stopped dealing with that firm, and would not deal with the patrons of said firm, and would get their friends to agree with them in their course, then the jury must find the prisoner not guilty.

"5. If the jury believe from the evidence that the object of the alleged conspirators was to benefit and protect themselves in the pursuit of their calling or craft, and was not to injure Baughman Brothers, although such might be the result, and that they confined themselves to notifying the public that they would not deal with Baughman Brothers, or any one thereafter patronizing that firm, and would attempt to get their friends to assist them in that course, then the prisoner was not a party to an unlawful conspiracy and he must be found not guilty."

Opinion states the case.

*Meredith & Cocke*, for the plaintiff in error.

*Attorney-General R. A. Ayers*, for the Commonwealth.

FAUNTLEROY, J., delivered the opinion of the court.

The plaintiff in error, W. F. Crump, was, on the 28th day of September, 1886, indicted for a criminal conspiracy, by a grand jury empanelled in the hustings court of the city of Richmond. The indictment was against the said Crump and others—his co-conspirators—and it contained two counts. A general demurrer was filed to the indictment and to each count thereof, which was sustained as to the second count; but was overruled as to the first count, which charges that "there is, and for more than twelve months last past there has been, in the city of Richmond, a certain trades' union or association, called and known as Richmond Typographical Union, No 90; that there is in said city, and has been for more than twelve months last past, a mercantile firm or partnership composed of G. H. Baughman, E. A. Baughman and C. C. Baughman, who do business under the firm name and style of Baughman Brothers, as printers and stationers; that there is in the said city, and has been for more than twelve months last past, another trades' union or labor association, called the Knights of Labor; that the said partnership of Baughman Brothers have a lawful right to follow and pursue their said business as printers and stationers, without being molested or interfered with by any one, so long as they peaceably pursue the same according to the laws of the land. That the trades' union or association called Richmond Typographical Union, No. 90, is composed of about 100 members, most of whom are to the grand jurors unknown. That the said trades' union or labor association called the Knights of Labor is composed of several thousand members, most of whom are to the grand jurors unknown. That Joseph M.

Shelton, G. Waddy Wilde and W. F. Crump, are members of said trades' union or association called Richmond Typographical Union, No 90; and W. H. Mullen, James A. Healy, J. M. Lewis, Perry Jones and J. H. Schonberger, are members of said trades' union or labor association called Knights of Labor. That within twelve months last past, to-wit: On the 4th day of February, 1886, and on many days thereafter, the said G. Waddy Wilde, Joseph M. Shelton and W. F. Crump, together with all the other members of said trades' union or association called Richmond Typographical Union, No. 90, and W. H. Mullen, James A. Healy, J. M. Lewis, Perry Jones and J. H. Schonberger, together with all the other members of the said trades' union or labor association called the Knights of Labor, who are to the grand jurors unknown, with force and arms, at the said city, and within the jurisdiction of the said hustings court, well knowing the facts hereinbefore averred, did unlawfully, maliciously, wickedly and corruptly, knowingly and intentionally, combine, conspire, and confederate together to injure, ruin, break up and destroy, the said G. H. Baughman, E. A. Baughman and C. C. Baughman, trading as Baughman Brothers, in their said business as printers and stationers as aforesaid, by unlawfully, wickedly, maliciously and corruptly, knowingly and intentionally, making threats to a great number of persons, to-wit: To H. J. Myers, a member of a mercantile firm in said city, trading as Slater, Myers & Co., which firm is composed of William L. Slater, Herman J. Myers and John G. Wade; to William F. Seymore, a member of a mercantile firm in said city, trading as J. H. Griffith & Co., which firm is composed of J. H. Griffith and William F. Seymore; to Luke Harvey, a member of a mercantile firm in said city, trading as Ellison & Harvey, which firm is composed of William Ellison, Luke Harvey and Frederick L. Swift; to G. A. Lathrop, a member of a mercantile firm in said city, trading as G. A. Lathrop & Co., which firm is composed of the said G. A. Lathrop, and to many other per-

sons to the grand jurors unknown—all of whom had theretofore
been regular customers of the said firm of Baughman Brothers—
that if they, the said H. J. Myers, W. F. Seymore, Luke Har-
vey, G. A. Lathrop, or their said mercantile firms, as above
named, or other persons, to the grand jurors unknown, there-
after bought anything from the said firm of Baughman
Brothers, or employed them, the said Baughman Brothers, in
their said business as printers, they, the said Wilde, Shelton,
Crump, and all the members of the said trades' union or asso-
ciation called Richmond Typographical Union, No. 90, and
they, the said Mullen, Jones, Lewis, Healy and Schonberger,
and all the other members of the said trades' union or labor
association called the Knights of Labor, would do all in their
power to break up and destroy the business of the said H. J.
Myers, W. F. Seymore, Luke Harvey, G. A. Lathrop, and their
said mercantile firms, as above named, and many other per-
sons to the grand jurors unknown, who had theretofore been
customers of the said Baughman Brothers, and, by and through
said threats, they, the said Crump, Wilde, Shelton, Mullen,
Lewis, Healy, Jones and Schonberger, and all the other mem-
bers of the said trades' union or association called Richmond
Typographical Union, No. 90, and all the other members of
the said trades' union or labor association called the Knights
of Labor, did, then and there, by reason of said threats, drive
off, hinder, deter, and prevent the said H. J. Myers, W. F.
Seymore, Luke Harvey, G. A. Lathrop, and their said mer-
cantile firms, as above named, and many other persons to the
grand jurors unknown, who had theretofore been customers
of the said Baughman Brothers, from buying anything from,
or from dealing with in any way, or from employing as
printers, the said firm or partnership of G. H. Baughman, E.
A. Baughman and C. C. Baughman, doing business as Baugh-
man Brothers, as aforesaid; and they did, then and there, by
their said unlawful, malicious, wicked and corrupt threats, and
by their said unlawful acts, as hereinbefore set forth, do a

serious injury to the business of the said Baughman Brothers, against the peace and dignity of the commonwealth of Virginia."

The defendant, W. F. Crump, thereupon pleaded not guilty, and, electing to be tried separately, he was so tried; and the jury, on the 13th day of May, 1887, found him guilty, by their verdict, and fined him $5; which verdict the court, upon. motion of the defendant, refused to set aside and grant a new trial, but approved the said verdict and entered up the judgment here complained of.

Upon the trial, the defendant excepted to the rulings of the court giving the instruction asked for by the commonwealth, and refusing to give the instructions asked for by him; and he also excepted to the overruling by the court of his motion to set aside the verdict and grant to him a new trial.

The first error assigned, is the action of the court in overruling the demurrer to the first count of the indictment. It is objected that the indictment does not charge a conspiracy to do any unlawful act, and does not particularly state the means to be used by the conspirators to break up and destroy the business of Baughman Brothers, and show that the means to be used were unlawful. The objection cannot be sustained— it is wholly groundless and gratuitous; as is plainly manifest by the first count in the indictment (which we have, purposely, set out in full), to which the defendant pleaded, and upon which the issue was made up and tried, and under which the defendant was found guilty. It charges, directly, that the defendant and others " did unlawfully and maliciously, wickedly and corruptly, knowingly and intentionally, combine, conspire and confederate together, to injure, ruin, break up and destroy, Baughman Brothers in their business as printers and stationers;" and that they did this by unlawfully, wickedly, maliciously, knowingly, intentionally and corruptly making threats to a great number of persons mentioned, and others unknown to the grand jurors, all of whom had been, and were

at the time, regular customers and patrons of the said Baughman Brothers; and that they did, then and there, by their said unlawful, malicious, wicked and corrupt threats, and by their said unlawful acts, as hereinbefore set forth, do a serious injury to the business of the said Baughman Brothers, and a still greater injury to the peace, dignity and good name of the commonwealth of Virginia—to the evil example of all her people.

This specially and exactly charges a criminal conspiracy unprovoked, wanton, and unlawful, both as to the *end* aimed at and the *means* used to accomplish it. It charges a combination of this defendant and his co-conspirators to ruin, break up, and destroy the business of Baughman Brothers, and it charges the means used, and the success of the unlawful endeavor operated upon the peaceful and honest industries of the customers and patrons of Baughman Brothers.

A conspiracy or combination to injure a person in his trade or occupation is indictable. In the case of *Rex* v. *Eccles*, 1 Leach, 274, several persons were indicted for conspiring to impoverish a tailor, and to prevent him, by indirect means, from carrying on his trade. They were convicted; and, upon a motion in arrest of judgment, it was objected (as in this case) that the indictment ought to have stated the acts that were committed to impoverish the tailor and prevent him from carrying on his trade, in order that the defendants might thereby have had notice of the particular charges they were called upon to answer. But Lord Mansfield, without hearing the prosecution, said: "The conspiracy and object of it, are both stated in the indictment, but it is contended that the means by which the intended mischief was effected, ought also to have been particularly set forth, as in the case of *Rex* v. *Sterling;* but this is certainly not necessary, for the offence does not consist in doing the acts by which the mischief is effected, for they may be perfectly indifferent, but in conspiring with a view to effect the intended mischief, by any means.

The illegal combination is the gist of the offence." Buller, Justice, said: "The indictment states 'that the defendants, intending unlawfully and by indirect means to impoverish the prosecutor, unlawfully did conspire,' &c., but nothing need to have been stated about the means, for the means are matter of evidence, to prove the charge, and not the crime itself. The indictment, therefore, rather states too much than too little." This case was under consideration in the recent case of *Mogul Steamship Co.* v. *McGregor, Gow & Co.*, 15, Q. B. Div., 476, decided in 1885, when Lord Coleridge, C. J., said of the case, "It seems to both of us to be within the principle of an old case decided by Lord Mansfield, *Rex* v. *Eccles*, 1 Leach, 200, 274, 276, * * * and so far as I know, the case itself is as good law now as when Lord Mansfield enunciated it, and could be upheld at the present day. It seems to me also to be within the principle neatly stated by Tindal, C. J., in *The Queen* v. *O'Connell*, 11 Clark and F., 234, as to what is evidence necessary to make out conspiracy; and also of the opinion of Lord Fitzgerald in the case of *Regina* v. *Parnell.* (The Times of January 25–6, 1881.) If the judgment of the learned judge is correct—and I do not mean to intimate the slightest doubt as to its correctness—that a conspiracy to do the thing which has been called by the name of '*Boycotting,*' is unlawful and an indictable offence; and if so, then a thing for which an action will lie, an action may well lie for that which is complained of here." "A combination is a conspiracy in law, whenever the act to be done has a necessary tendency to prejudice the public or oppress individuals by unjustly subjecting them to the power of the confederates and giving effect to the purposes of the latter, whether of extortion or mischief." (Wharton's Crim. Law, 3 Vol., sec 2322, 6th edition.) In section 2304 of same writer, it is said the unlawful purpose may be "some object of the confederation which it would be unlawful for them to attain either singly, or which, if lawful singly, it would be dangerous to the public to

be attained by the combination of individual means." See Greenleaf on Evidence, 3 vol., sec. 90. In the case of *Reg.* v. *Druitt*, 10 Cox C. Cases, Baron Bramwell said : "The liberty of a man's mind and will, to say how he should bestow himself and his means, his talents and his industry was as much a subject of the law's protection, as was that of his body"—and "if any set of men agree among themselves to coerce that liberty of mind and thought, by combination and restraint, they would be guilty of a criminal offence, namely, that of conspiring against the liberty of mind and freedom of will of those towards whom they conducted themselves. He was referring to coercion and compulsion—something that was unpleasant and annoying to the mind operated upon, and he laid it down as clear and undoubted law, that if two or more persons agreed that they would, by such means, co-operate together against that liberty, they would be guilty of an indictable offence. The public had an interest in the way in which a person disposes of his industry and his capital; and if two or more persons conspired, by threats, intimidation, or molestation, to deter or influence him in the way he should employ his industry, his talents, or his capital, they would be guilty of a criminal offence. This was the common law of the land," &c.

In the case of the *State* v. *Donaldson*, 32 N. J. L., 157, it was held to be an "indictable conspiracy for several employees to combine and notify their employer that unless he discharges certain enumerated persons, they will in a body quit his employment." In his opinion in that case Chief-Justice Beasley said, "there are a number of cases in which neither the purpose intended to be accomplished, nor the means designed to be used, were criminal, which have been regarded to be criminal"—quoting *State* v. *Norton*, 3 Zab., 44; and citing *Rex* v. *Lord Gray*, 3 Hargrave's State Trials, 519; *Rex* v. *Sir Francis Deleval*, 3 Burr., 1434. He says: "These are all cases, it will be noticed, in which the act, which formed the foundation of

the indictment, would not, in law, have constituted a crime, if such act had been done by an individual; the *combination* being alone the quality of the transaction which made them respectively indictable." "The purpose designed to be accomplished becomes punitive, as a public offence, solely from the fact of the existence of a confederacy to effect such offence." "The doctrine of criminal conspiracy rests upon the obvious proposition, that the power of *many* for mischief against the *one* is so great, that the State should protect the *one.* Therefore the general principle on which the crime of conspiracy is founded, is this: that the confederacy of several persons to effect any injurious object, creates such a new and additional power to cause injury, as requires criminal restraint; although none would be necessary were the same thing proposed or even attempted to be done by persons singly." "Now, that many acts, which, if done by an individual, are not indictable, are punished criminally when done in pursuance of a conspiracy among numbers, is too well settled to admit of controversy. In many cases an agreement to do a certain thing has been considered as the subject of an indictment for conspiracy, though the same act, if done separately by each individual, without any agreement among themselves, would not have been illegal." *State* v. *Rowley,* 12 Conn., 112–13; *Regina* v. *Duffield,* 5 Cox C. C., 432; *State* v. *Crowley,* 41 Wis., 271.

The next error assigned, is, the action of the court in giving the instruction asked for by the Commonwealth, as follows: "If the jury believe from the evidence that the defendant, Crump, entered into an agreement with one or more of the defendants whereby they undertook to coerce the firm of Baughman Brothers to discharge from their employment, against the will of the said firm, certain persons then in their employment, and to take into their employment certain other persons that the said Baughman Brothers did not wish to take into their employment, then they are instructed that said agreement was unlawful; and if they believe further from the evi-

dence, that in pursuance and to carry out said agreement, he, the defendant, threatened any of the customers of the said Baughman Brothers, they (the said persons making said agreement) would injure the business of such customers, by intimidating their customers and making them afraid to continue their patronage of the customers of the said Baughman Brothers, then they must find the defendant guilty." The instruction plainly and correctly expounds the law against unlawful combination and guilty conspiracy to interfere with, molest, break up, and ruin the legitimate, licensed business of peaceable, useful, industrious and honest citizens, and to accomplish this end by the threat and intimidation of doing "*all in the power*" of the conspirators to "break up and destroy the business" of all the existing or future customers of Baughman Brothers, who should thereafter buy "anything from the said firm of Baughman Brothers, or employed them, the said Baughman Brothers, in their said business as printers." And the instruction, so far from being a mere declaration of abstract law, is a direct and proper application of the law to the case put in the indictment and made by the evidence. It is next to impracticable, to extend this opinion, by reciting the evidence, in detail, further than we shall do when we come to consider the error assigned upon the admissibility and sufficiency of the evidence in the record to justify the verdict.

The instructions which were asked for by the defendant and refused by the court, were properly refused, as they did not correctly expound the law, and were unwarranted by the evidence. And, more than the defect of having no predication in the evidence, they utterly and adroitly ignore the facts proved of the evil intent of the defendant and his confederates to do a wanton, causeless injury and ruin, to compel and coerce Baughman Brothers to give up the control and conduct of their own long established, useful and independent business, to the absolute dictation and control of a combination of the defendant and others styling themselves "Richmond Typo-

graphical Union, No. 90; " and to do this by the obtrusion, terrorism, excommunication and obloquy of the "boycott" against Baughman Brothers and all their customers in Richmond, Lynchburg, and throughout Virginia and North Carolina, *ad infinitum,* till they force the conquest and submission of all resistance to their demands and self-constituted management. A reign of terror, which, if not checked and punished in the beginning by the law, will speedily and inevitably run into violence, anarchy, and mob tyranny. We come now to the main question involved in this appeal, whether the evidence set forth in this record presents a conspiracy at common law? The determination of *this* question is, indeed, the object sought; as we not only infer from the paltry fine of *five* dollars imposed by the verdict, but by the intimation in argument by the able and accomplished counsel for the defendant.

Is "boycotting," as resorted to and practiced by the conspirators in this case, allowable under the laws of Virginia?

For a legal definition or explanation of the meaning and practical effect of the cabalistic word, as well as for a pertinent exposition of the law applicable to the facts of this case, we refer to the admirable opinion of Judge Wellford of the circuit court of the city of Richmond, in the case of *Baughman Brothers* v. *Askew,* Va. Law J., April No. 196, and also to the decision of the supreme court of Connecticut in the case of *State* v. *Glidden,* 55 Conn., 76. In that case the court says: "We may gather some idea of its (boycotting) real meaning, however, by a reference to the circumstances in which the word originated. Those circumstances are thus narrated by Mr. Justice McCarthy, an Irish gentleman of learning and ability, who will be recognized as good authority: 'Captain Boycott was an Englishman, an agent of Lord Earne, and a farmer of Lough Mark, in the wild and beautiful district of Connemara. In his capacity as agent he had served notice upon Lord Earne's tenants, and the tenantry suddenly retaliated, etc., etc. His life appeared to be in danger; he had to claim police pro-

tection. * * * To prevent civil war, the authorities had to send a force of soldiers and police to Lough Mark, and Captain Boycott's harvest was brought in, and his potatoes dug by the armed Ulster laborers, guarded always by the little army.'" The court proceeded to say : " If this is a correct picture, the thing we call a *boycott* originally signified violence, if not murder. * * * But, even here, if it means, as some high in the confidence of the trades' union assert, absolute ruin to the business of the person *boycotted*, unless he yields, then it is criminal." The essential idea of boycotting, whether in Ireland or the United States, is a confederation, generally secret, of many persons, whose intent is to injure another, by preventing any and all persons from doing business with him, through fear of incurring the displeasure, persecution and vengeance of the conspirators.

In the case of *State* v. *Donaldson*, 32 N. J., L., 151, Chief Justice Beasley, in delivering the opinion of the court, said : " It appears to me that it is not to be denied that the alleged aim of this combination was unlawful; the effort was to dictate to this employer whom he should discharge from his employ. This was an unwarrantable interference with the conduct of his business, etc. If the manufacturer can be compelled in this way to discharge two or more hands, he can, by similar means, be coerced to retain such workmen as the conspirators may choose to designate. So his *customers* may be proscribed, and his business, in other respects, controlled. I cannot regard such a course of conduct as lawful."

Chief Justice Shaw, in the case of *Commonwealth* v. *Hunt*, 4 Met., 111, said : " The law is not to be hoodwinked by colorable pretences; it looks at truth and reality through whatever disguises it may assume. It is said that neither threats nor intimidations were used; but no man can fail to see that there may be threats, and there may be intimidations, and there may be molesting, and there may be obstructing (which the jury are quite satisfied have taken place, from all the evidence

in the case), without there being any express words used, by which a man should show any violent threats towards another, or any express intimidation." "An intention to create alarm in the mind of a manufacturer, and so to force his assent to an alteration in the mode of carrying on his business, is a violation of law." *Regina* v. *Rowlands,* 5 Cox C. C., 436, 462–3; *Doolittle* v. *Schanbacher,* 20 Cen. Law J., 229.

Upon the trial of boycotters in New York, Judge Barrett said : " The men who walk up and down in front of a man's shop may be guilty of intimidation, though they never raise a finger or utter a word. Their attitude may, nevertheless, be that of menace. They may intimidate by their numbers, their pleadings, their methods, their circulars, and their devices."

It matters little what are the means adopted by combinations formed to intimidate employers, or to coerce other journeymen, if the design or the effect of them is to interfere with the rights, or to control the free action of others. No one has a right to be hedged in and protected from competition in business; but he has a right to be free from wanton, malicious and insolent interference, disturbance or annoyance. Every man has the right to work for whom he pleases, and for any price he can obtain ; and he has the right to deal with and associate with whom he chooses; or, to let severely alone, arbitrarily and contemptuously, if he will, anybody and everybody upon earth. But this freedom of uncontrolled and unchallenged self-will does not give or imply a right, either by himself or in combination with others, to disturb, injure or obstruct another, either directly or indirectly, in his lawful business or occupation, or in his peace and security of life. Every attempt by force, threat or intimidation, to deter or control an employer in the determination of whom he will employ, or what wages he will pay, is an act of wrong and oppression; and any and *every combination for such a purpose* is an unlawful conspiracy. The law will protect the victim and punish the movers of any such combination. In law, the offence is *the combination for the*

*purpose,* and no overt act is necessary to constitute it. *State* v. *Wilson,* 30 Conn., 507; *State* v. *Donaldson, supra; Walker* v. *Cronin,* 107 Mass., 564; *Carew* v. *Rutherford,* 106 Mass., 10–15, *Master Stevedore's Association* v. *Walsh,* 2 Daly, 12; *Walsby* v. *Auley,* 3 Law Times, N. S., 666; *Reg.* v. *Duffield,* 5 Cox C. C., 432; *Parker* v. *Griswold,* 17 Conn., 302; *Springhead Spinning Co.* v. *Riley,* 6 L. R., Equity Cases, 551; *Gilbert* v. *Mickle,* 4 Sandf., 381.

A wanton, unprovoked interference by a combination of many with the business of another for the purpose of constraining that other to discharge faithful and long-tried servants, or to employ whom he does not wish or will to employ, (an interference intended to produce and likely to produce annoyance and loss to that business) will be restrained and punished by the criminal law, as oppressive to the individual, injurious to the prosperity of the community, and subversive of the peace and good order of society.

The recent case of *State* v. *Glidden,* already referred to, decided by the supreme court of Connecticut, is both in principle and features identical with the case under review. The Carrington Publishing company had in their employ a number of printers known as "*non-union men,*" or "*rats.*" The Typographical Union, the Knights of Labor, the Trades' Council, the Cigar-makers' Union, and other affiliated secret organizations, waited upon the company and demanded that their office be made a "*union office*" within twenty-four hours. Upon the refusal of the company to make their office a "union office," a *boycott* was instituted against them, which, though not openly published, as in this case, was fully proved. The court in its opinion said: "If the defendants have the right which they claim, then all business enterprises are alike subject to their dictation. No one is safe in engaging in business, for no one knows whether his business affairs are to be directed by intelligence or ignorance—whether law and justice will protect the business, or brute force, regardless of law, will control it, for

it must be remembered that the exercise of the power, if conceded, will by no means be confined to the matter of employing help.  Upon the same principle and for the same reasons, the right to determine what business others shall engage in, when and where it shall be carried on, &c., will be demanded, and must be conceded.  The principle, if it once obtains a foothold, is aggressive and is not easily checked.  It thrives on what it feeds on, and is insatiate in its demands.  More requires more.  If a large body of irresponsible men demand and receive power outside of law, over and above law, it is not to be expected that they will be satisfied with a moderate and reasonable use of it.  All history proves that abuses and excesses are inevitable.  The exercise of irresponsible power by men, like the taste of human blood by tigers, creates an unappeasable appetite for more."  Confidence is the cornerstone of all business—confidence that the government through its courts will be able to protect their rights; but if their rights (of business men) are such only as a secret, irresponsible organization is willing to give, where is that confidence which is essential to the prosperity of the country?"  "The end would be anarchy, pure and simple, and the subversion not only of all business, but also of law and the government itself.  They (defendants) had a right to request the Carrington Publishing company to discharge its workmen and employ themselves, and to use all proper argument in support of their request, but they had no right to say ' you shall do this, or we will ruin your business,' much less had they a right 'to ruin its business.  The fact that it is designed as a means to an end, and that end in itself considered, is a lawful one, does not divest the transaction of its criminality."

The defendant lays great stress upon the case of *State* v. *Hunt*, 4 Met., 111, as authority to sustain the legality of *boycotting;* but there is an obvious distinction between that case, and that of this defendant.  That was a club or combination of journeymen boot-makers simply to better their own condi-

tion; and it had no aim or means of aggression upon the business or rights of others—they simply had regulations for themselves, and did not combine, or operate, for a result mischievous, meddlesome, and oppressive towards others. But, even in that case, the court, after supposing the case of a combination for the ultimate and laudable object of reducing, *by mere competition*, the price of bread to themselves and their neighbors, said "The legality of such an association will, therefore, depend upon the means to be used for its accomplishment. If it is to be carried into effect, by fair and honorable means, it is, to say the least, innocent; if by falsehood or *force*, it may be stamped with the character of *conspiracy.*" *Force* may be operated either physically or mechanically; or it may be coercion by fear, threat, or intimation of loss, injury, obliquy, or suffering.

The evidence in this case shows, that, while Baughman Brothers were engaged in their lawful business, as stationers and printers, the plaintiff in error and the other members of the Richmond Typographical Union, No. 90, *conspired* to compel Baughman Brothers to make their office a "union office," and to compel them not to employ any printer who did not belong to the said union; that upon the refusal of Baughman Brothers to make their office (or business) a "union office," the plaintiff in error and others composing the said Richmond Typographical Union, No. 90, conspired and determined to *boycott* the said firm of Baughman Brothers, as they had threatened to do, and sent circulars to a great many of the customers of the said firm informing them, that they had, "with the aid of the Knights of Labor, and all the trades' organizations in this city (Richmond), boycotted the establishment of Messrs. Baughman Brothers"; and, formally, notifying the said customers, that the names of all persons who should persist in trading, patronizing, or dealing with Baughman Brothers, after being notified of the *boycott*, would be published weekly in the "*Labor Herald*" as a "*black list*," who, in their turn,

would be *boycotted* until they agreed to withdraw their patronage from Baughman Brothers; and, accordingly, the employees of Baughman Brothers were mercilessly hounded by publication after publication, for months, in the " *Labor Herald*," (which was the boasted engine of the boycotting conspirators,) whereby it was attempted to excite public feeling against them and prevent them from obtaining even board and shelter; and the names of the customers and patrons of the said firm were published in the said sheet under the standing head of " *black list*."

The length of this opinion will preclude the mention of even a tithe of these incendiary publications, week after week for months; but not only Baughman Brothers and their employees and their customers, but the hotels, boarding-houses, public schools, railroads and steamboats conducting the business travel and transportation of the city, were listed and published under the obloquy and denunciation of the " black list." One or two specimens will suffice: "*Boycott* Baughman Brothers and all who patronize them." " Watch out for Baughman Brothers '*rats*,' and find out where they board. It is dangerous for honest men to board in the same house with these creatures. They are so mean that the air becomes contaminated in which they breathe." " Boycott Baughman Brothers every day in the week." " Boycott Baughman Brothers because they are enemies of honest labor." " Boycott Baughman Brothers' customers wherever you find them." " The Lynchburg boys will begin to play their hand on Messrs. Baughman's boycotted goods in a short time. The battle will not be fought in Richmond only, but in all Virginia and North Carolina will be raised the cry, ' Away with the goods of this tyrannical firm.' " " Let our friends remember it is the patronage of the Chesapeake and Ohio; Richmond, Fredericksburg and Potomac; Richmond and Danville, and Richmond and Alleghany railroads that is keeping Baughman Brothers up." " We are sorry to see the Exchange Hotel on the black list.

There will be two thousand strangers in this city in October—none of whom will patronize a hotel or boarding-house *whose name appears on that list.*" "The boycott on Baughman Brothers is working so good, that a man cannot buy a single bristol-board from the *rat* firm without having his name put upon the *black list.*" "The old 'rat' establishment is about to cave in. Let it fall with a crash that will be a warning to all enemies of labor in the future."

It was proved, that the conspirators declared their set purpose and persistent effort to "*crush*" Baughman Brothers; that the minions of the boycott committee dogged the firm in all their transactions; followed their delivery wagon; secured the names of their patrons; and used every means, short of actual physical force, to compel them to cease dealing with Baughman Brothers—thereby causing them to lose from one hundred and fifty to two hundred customers and ten thousand dollars of net profit. The acts alleged and proved in this case are unlawful, and incompatible with the prosperity, peace, and civilization of the country; and, if they can be perpetrated, with impunity, by combinations of irresponsible cabals or cliques, there will be the end of government, and of society itself. Freedom—*individual* and *associated*—is the boon and the boasted policy and peculium of our country; but it is *liberty* regulated by *law;* and the motto of the law is: "*Sic utere tuo, ut alienum non leadas.*"

The plaintiff in error was properly convicted; and the judgment of the hustings court complained of is affirmed.

JUDGMENT AFFIRMED.