BALDWIN *v.* ESCANABA LIQUOR DEALERS' ASSOCIATION.

1. CONSPIRACY—BOYCOTT—COMBINATION FOR ILLEGAL PURPOSES.
   A combination of persons formed for the purposes of injuring the business of another is illegal, and many acts committed by the combination are illegal, which would not be illegal if committed by an individual.

2. SAME—THREATS.
   The law recognizes and gives full force to threats which are not spoken and which are not accompanied by violence.

3. SAME—JOINT WRONG—EXTENT OF LIABILITY.
   When a person is shown to have become a party to an illegal conspiracy, he is liable for all the acts performed by any of his co-conspirators in furtherance of the object of the conspiracy.

4. BOYCOTT—INTERFERENCE WITH BUSINESS—NEWSPAPERS.
   In a suit to enjoin a boycott and restrain an association of liquor dealers from injuring the newspaper business of complainant, evidence considered and *held*, to show an unlawful conspiracy to induce his customers to cease dealing with him.

5. SAME—CONSPIRACY—INJURY TO BUSINESS.
   A combination formed for the purpose of injuring a person in his trade or occupation is unlawful.

6. SAME.
   Threats of an unspoken or covert nature as well as uttered threats are recognizable in the law.

7. SAME—DEFINITION—WORDS AND PHRASES.
   Acts of several persons in combination intended to cut off legitimate custom and patronage of a newspaper, constitute a boycott.

8. SAME.
   Boycott may be defined to be a combination of several persons to cause a loss to a third person by inducing others against their will to withdraw from him their beneficial business intercourse through threats that, unless they comply with the demands, the persons forming the combination will cause them some loss or injury.

9. INJUNCTION—EQUITY—RESTRAINING BOYCOTT.
   A boycott may be restrained by injunction.

10. BOYCOTT—THREATS—FEAR.
    Intimidation, within the meaning of the law, is not necessarily limited to threats of violence to person or property.

11. SAME.
    A person's occupation or calling, by means of which he earns a livelihood and supports himself and those dependent upon him, is property within the meaning of the law, and entitled to protection as such.

12. SAME.
    Persons may organize and persuade and induce others to join them, but when they resort to unlawful means to cause injury to others with whom they have no relations, contractual or otherwise, the limit permitted by the law is passed and they may be restrained.

13. DAMAGES—EQUITY—JURISDICTION.
    Equity, having once acquired jurisdiction, will retain it to give such full relief as will finally dispose of the controversy, and where complainant is entitled to an injunction to restrain a boycott, the court will award also such damages as he may have sustained.

Appeal from Delta; Stone, J. Submitted February 23, 1911. (Docket No. 13.) Decided March 13, 1911.

Bill by Francis L. Baldwin against the Escanaba Liquor Dealers' Association, an unincorporated association, Peter Lemmer, Philip Dupont, Irenee Marchand, Nels Ahlquist, Jacob Miller, Bert Boddy, Arthur G. Crose, John J. Cleary, and Menasip Perron for an injunction and damages. From a judgment for complainant, defendants appeal. Affirmed.

Cummiskey & Spencer (John Power, of counsel), for appellants.

A. H. Ryall, for appellee.

BROOKE, J. The opinion of the learned circuit judge who heard this case, and who is now a member of this

court, so fully covers the questions of law and fact involved that we here insert it and adopt it as our own:

"The complainant is the owner and publisher of the Escanaba Journal, a weekly newspaper published in the city of Escanaba, and he has been such owner and publisher since September, 1906.

"The bill of complaint was filed to obtain an injunction against the defendants, to restrain them from interfering with, intimidating, boycotting, molesting, or threatening in any manner the customers or patrons of the complainant, or any other person or persons, for the purpose of inducing such person or persons not to deal with, or advertise or do business with, the complainant in the conducting of his said newspaper published as aforesaid.

"The bill alleges that at the time complainant purchased said newspaper there were about 100 saloons in said city, and in other parts of said county there were about 50 saloons. That there were also in said city two breweries, and also two wholesale liquor houses. It is also alleged that at the time aforesaid there existed in the said city of Escanaba a number of houses of ill fame, which were conducted in an open and lawless manner, and with the full knowledge and acquiescence of the authorities of said city and county. It is further alleged that, shortly after the complainant acquired said paper, he published therein certain articles and editorials, criticising the manner in which said houses of ill fame were permitted to exist and continue in said city, and also published articles and editorials and news items, criticising and exhibiting the unlawful methods in which the saloon and liquor business was carried on and conducted in said city, and that he has ever since said time continued to print and publish in said paper, at various times, articles, editorials, and news items, showing, criticising, and exhibiting the unlawful methods in which said saloon and liquor business has been and is being carried on in said city and county, and also exhibiting and criticising the existence of the said houses of ill fame, which have at various times existed in said city. That after the purchase of said paper, complainant improved its appearance and make-up, and also its general standing as a newspaper; that he increased its circulation by about 400 per cent. within six months after it was so acquired, and that thereby the advertising value of said paper was greatly increased. That he acquired a

large number of new advertising patrons, from which source he reaped a considerable profit. That he also had a large number of patrons for whom he did job printing of all kinds, which was also a source of profit to complainant.

"That during 1907 complainant continued to publish articles of various sorts in said paper, criticising the conditions in said city and county as above mentioned, and that during said year a large number of advertising and job printing customers withdrew their patronage, stating to complainant that various saloon keepers and other persons interested in the saloon business in said city objected to said customers patronizing complainant, and threatening to withdraw their patronage from said customers, unless they, complainant's customers, withdrew their patronage from complainant. That there existed in said city for several years an organization of saloon keepers and other persons interested in the liquor business, the exact name of said organization being unknown to complainant, but which is commonly known as the Escanaba Liquor Dealers' Association. That the same is a secret organization, and that no one, excepting members thereof, is admitted to its meetings, but that said organization is a voluntary, unincorporated association, consisting of more than five members. That the purpose of said organization is to protect the liquor interests of said city, and to use its power and influence to repel any attack made upon the methods by which said business is conducted.

"That on or about January 15, 1908, the said association held a meeting at a hall in said city, known as Lemmer's hall and owned by Peter Lemmer, one of the defendants hereinafter mentioned, which said meeting was presided over by one Menasip Perron, who was at that time and still is mayor of said city of Escanaba, and who was and still is a stockholder of the Richter Brewing Company, one of the breweries in said city, and who has at various times held offices in said Richter Brewing Company, and who was at the time aforesaid and still is a stockholder in the Bink Wholesale Liquor & Supply Company, one of the liquor houses in said city heretofore mentioned, and that at said meeting it was agreed by said association that a committee should be appointed from among its members for the purpose of visiting and waiting upon customers of complainant, and demanding that they withdraw their business and patronage from complainant, and that upon the failure of said customers to

accede to such demands, then that said association would cause said patrons to be boycotted, and would use its influence to injure the business and trade of said customers. That the committee appointed by such association consisted of the following persons: Peter Lemmer, Philip Dupont, Irenee Marchand, Nels Ahlquist, Jacob Miller, Bert Boddy, and also other persons whose names are unknown to complainant. That said persons so composing said committee are and were each engaged in the saloon and liquor business in the said city. That John J. Cleary is an officer of said association, to wit, its treasurer, and complainant alleges that at sundry times one Arthur G. Crose and the said Bert Boddy have been and have acted as president of said association.

" That shortly after said meeting the said committee visited a large number of customers of complainant and demanded that they withdraw their business patronage from complainant, threatening to boycott and otherwise injure the trade and business of complainant's customers if they did not withdraw their patronage from complainant; and that shortly after said customers were visited by said committee a large number of complainant's customers withdrew their business and patronage from complainant, and have continued to withhold the same ever since, to the damage of complainant of $10,000.

" The bill proceeds to charge that all of the defendants are unlawfully and wrongfully combining and confederating together to prevent, by intimidation and threats, all persons and all customers of complainant from patronizing him, or from advertising in the said paper, and from giving job printing to complainant, and from in any other way patronizing or dealing with complainant, and that said defendants have for several months last past and still are constantly pursuing a course of threats and intimidations and persuasions, for the purpose, and by means of such intimidation and threats and fear, not only to prevent customers from dealing with and patronizing complainant, but also to intimidate and prevent customers and other persons patronizing and dealing with the customers of complainant, who have continued and who still continue to patronize complainant. That by reason of the unlawful conduct of said defendants, the trade and business and good will of complainant have been greatly damaged, and that the future business and good will of complainant

have been greatly damaged, to wit, to the extent of $10,000.

"I have not attempted here to set forth all the allegations of said bill, but enough to show the nature of the complaint. The bill prays for a temporary and permanent injunction, restraining the defendants from interfering with, intimidating, boycotting, molesting, or threatening in any manner the customers or patrons of complainant, or any other person or persons, for the purpose of inducing such person or persons not to deal with or advertise or do business with complainant; from boycotting complainant, either by the distribution of letters or circulars, or in any other manner; from giving any directions or orders to committees, associations, agents, or otherwise, for the pursuance of any such acts hereinbefore complained of, and from in any manner whatsoever impeding, obstructing, or interfering with the regular operation and conduct of the business of complainant; and that upon the hearing, the damages accruing to complainant by reason of the unlawful acts of said defendants may be determined, and that a decree may be rendered in favor of complainant and against said defendants for the payment of said damages.

"All of the defendants, except the Escanaba Liquor Dealers' Association, appeared and answered the bill. The bill was taken as confessed as to the said association. The answer of the other defendants, while denying the material allegations of the bill upon its face, really does not meet all of the allegations of the bill. However, I shall treat the pleadings as though the answer denied the material allegations of the bill in disposing of the case. The cause being at issue was heard at the last July term, the testimony being taken in open court; thus giving the court the advantage of both seeing and hearing the witnesses.

"Before referring to the testimony in the case, I desire to refer to certain propositions of law applicable to the case, which should be borne in mind:

"(1) That a combination of persons, formed for the purpose of injuring the business of another, is illegal, and many acts committed by the combination are illegal which would not be illegal if committed by an individual. *Doremus* v. *Hennessy*, 62 Ill. App. 391.

"(2) That the law recognizes and gives full force to

threats which are not spoken and which are not accompanied by violence.

"(3) That, when a person is shown to have become a party to an illegal combination or conspiracy, he is liable for all the acts performed by any of his co-conspirators, in furtherance of the object of the conspiracy.

"Before coming to the evidence in the case, it will be best to dispose of certain exceptions to a portion of the bill. By these exceptions the defendants desired to have stricken from the bill the entire fourth paragraph, which stated that there existed in the city of Escanaba a number of unlawful places which were conducted in an open and lawless manner, with a full knowledge and acquiescence of the authorities of said city and county; and also to strike from the bill as scandalous that portion of its fifth paragraph commencing with the word 'criticising' in the second line of said paragraph and ending with the word 'Escanaba' in the fourth. At the opening of the hearing, by consent of counsel, the twenty-second paragraph of the bill was stricken out. Should the other excepted matter be stricken? The complainant urges that these charges were inserted because they were true in fact, and were so proven by the witnesses produced by the defendants and by the defendants themselves, practically all of whom testified that saloons were run in violation of law, and slot machines kept therein during the time that these articles were published by complainant. That the reasons for inserting these articles was to show that the complainant was justified, as the publisher of a newspaper, in taking the position which he did in regard to these various violations of the law. Had these various articles appeared without any excuse, complainant would hardly have come into court with clean hands. While, on the contrary, by proving that these conditions existed, he has very properly strengthened his case by showing the necessity of some sort of a protest against this condition of lawlessness. I think that the position taken by the complainant upon this matter is justified by the record, and I must refuse to strike out the matters excepted to.

"Coming to the evidence in the case, we may start with this fact, admitted by the defendants, that there was a meeting of the liquor dealers on or about January 15, 1908, which had to do with complainant. The twenty-sixth paragraph of the answer contains this language:

"'And these defendants, and each of them, say that this purpose

of bringing about a better observance of the laws relating to the conduct of the liquor traffic was the sole object of that meeting and of the adjourned meeting. That the matter contained in the publications of complainant's paper, in its attacks upon persons engaged in the liquor traffic, was referred to, and that a committee of those present was appointed to confer with persons who were believed to be near the complainant, and urge them to induce him to cease his bitter and virulent attacks upon the liquor traffic and persons engaged in it; and that said committee accordingly visited some of the business men of the city of Escanaba and requested them to use their influence and good offices with the complainant, to induce him to adopt a different course in his publication aforesaid.'

"It may as well be said in the outset that there is a sharp conflict in the testimony, and especially between that of Herman Salinsky and James B. Wilkinson on the one hand, and that of the defendants, constituting the committee, on the other. It is undisputed that on the day this committee was appointed it visited the store known as the Fair Savings Bank Department Store, managed by Mr. Salinsky, and there saw both Mr. Salinsky and Mr. Wilkinson. The committee consisted of the defendants named as such committee in the bill of complaint. Mr. Salinsky testifies that at that time he knew the members of the committee, and knew that they were engaged in the saloon business. He had heard of the appointment of the committee, and its object. He testified in part as follows:

" ' The one that spoke up said, "You know what we are here for?" I says, "Yes, I understand you are out this afternoon." "And you know what our intentions are?" I says, "I know quite well." And the other one spoke up and said, "Where is Wilkinson!" I says, "You will find him on the third floor." One of them spoke up, "As long as you understand it, Herman, that is all there is to it." And they went to the elevator and took the elevator to the third floor.

" '*Q.* Did you have any further talk with them about Mr. Baldwin before they went up? Did they mention his name or the Journal?

" '*A.* Why, one of them did; yes, sir.

" '*Q.* What did he say?

" '*A.* He said, " We are out in regard to the Baldwin matter." I said, " I understand you are."

" 'Q. When you said you understood they were, what did you
mean ? What did you understand ?

" 'A. I understood it was a boycott of the Journal; not to do
any business with him, or with the Journal.

" 'Q. Had you been doing any business prior to that time with
the Journal ?

" 'A. Yes, sir; I had.

" 'Q. Did you do any business with the Journal after that time ?

" 'A. I did once or twice, a small matter. I had to balance a bill.

" 'Q. What was your reason for stopping doing business with the
Journal ? Did this committee have anything to do with it ?

" 'A. I looked upon it from a business standpoint. If I did bus-
iness with the Journal, I was to lose business in our store—lose cus-
tomers. That is the understanding I had given to me.

" 'Q. Is that the reason ?

" 'A. In order to protect the interests of the Fair Savings Bank,
I stopped business with the Journal.

" 'Q. Did you have any other reason for stopping besides that ?

" 'A. No other reason, but just that alone.

" 'Q. When they left you, where did they go ?

" 'A. They took the elevator and went to the third floor.'

" This witness further testified that prior to that time
he had been doing business with the Journal to the amount
of about $50 a month on an average. He did not do the
same amount of business after January, 1908. He had
not done any advertising with complainant to any extent
until recently. A while ago he gave a few bills that he
wanted, to balance up his account. Had it not been for
this talk he would have given advertising to the Journal
from January, 1908, to the present time. He is not do-
ing advertising with complainant now, because he feels
that it would injure that business to do it, and he was
afraid to do it. He had been interviewed by friends of
his to keep away from the Journal on account of the boy-
cott more particularly than anything else. That is the
reason why he is not getting work and advertising at this
time. This is not all of the testimony of this witness, but
what has been referred to shows the general trend of it.
A number of the defendants composing the committee
denied that any such conversation took place as testified
by Salinsky. It is only fair to say, however, that the de-
fendants Lemmer, Dupont, Marchand, and Ahlquist did
not pretend that they heard all of the conversation.

" The witness James B. Wilkinson testified that his
business was that of a furniture and undertaking mer-

chant; that he had been in that business for 10 years; that his place of business was on the third floor of the Fair Savings Bank Department Store; that you reached the store through the Fair Savings Bank Store by stairway and elevator. He knows complainant and has known him for three years and had given him business, printing bill heads, letter heads, and envelopes. He knows the defendants Ahlquist, Dupont, Miller, Boddy, and Marchand. They called upon him in January, 1908. They came together in a body. He further testified:

" '*Q.* Just tell us what conversation you had with them and what they said to you at that time.

" '*A.* As near as I can remember, they came up in the elevator, and they followed each other back through the store. I was sitting at the desk, and I think it was Mr. Boddy, he approached me first, and told me they were a committee, and asked me not to trade with Mr. Baldwin. I told them that I didn't do any advertising. My advertising was done through the Fair Store. They mentioned the other matters, the matter of printing bill heads and such like. I told them I thought it was infringing upon my rights as a business man and citizen, and I didn't care to comply with their request.

" '*Q.* What did they say to that—anything ?

" '*A.* Well, they simply turned away and said it was up to me.'

"Upon cross-examination the attention of this witness was called to his affidavit attached to the bill of complaint, and the same was offered in evidence. An examination of that affidavit will show that there is no material difference between its statements and the testimony of the witness, which is given above only in part.

" The testimony of this witness was also denied by the defendants composing the committee, except that. the defendants Lemmer, Dupont, Marchand, and Ahlquist claimed that they did not hear much of the conversation. The general trend of the testimony of the defendants is to the effect that they simply sought to have Mr. Wilkinson see complainant and urge him to desist from his attacks upon them. The affidavits of these defendants, used upon the motion to dissolve the injunction, were offered in evidence. upon the hearing. They were substantially alike. The affidavit of the defendant Lemmer sets forth as follows:

" ' Deponent further says that said committee did call upon one James B. Wilkinson, mentioned in said bill of complaint in an affi-

davit attached thereto, for the purpose of requesting the said James B. Wilkinson to use his influence with complainant in regard to certain articles then being published in complainant's paper. That nothing was said to said James B. Wilkinson in regard to his withdrawing his patronage from said paper, but that, as soon as deponent and other members of the committee mentioned their business to said James B. Wilkinson, he informed them that he, the said James B. Wilkinson, would attend to and manage his own business, and that they could do the same.'

"As I said in giving my reasons for retaining the injunction, in referring to these affidavits:

" 'This is very peculiar. What should have led Wilkinson to say to them that he would manage his own business and attend to the same, unless there was some effort being made to induce Wilkinson to change his course of business, it is difficult to see or understand.'

"I am of the opinion that the witnesses Salinsky and Wilkinson testified truthfully, and that they are entitled to belief. It was very apparent that many of the witnesses for the complainant were in sympathy with, or were under the influence of, the defendants. This is notably so with the witness Thomas Richer. This man had made a strong affidavit which was attached to the bill of complaint, and which is referred to in his testimony. He afterwards made an affidavit denying the statements contained in this first affidavit, and upon the hearing his memory was very defective.

" I am satisfied from the evidence that there was a conspiracy or combination formed at the meetings held in January, 1908, looking to the interfering with the legitimate business of the complainant by way of boycott, if he did not desist from further publications relating to the liquor and kindred business in the city of Escanaba. The acts of the committee and different members of the committee, and the acts of different members of the meeting appointing the committee, all tend to the same end, to wit, to induce customers of the complainant from further doing business with him. The conversation of the defendant Miller with the witness Lohmiller, in which, upon being told that Lohmiller had had some printing done by complainant, Miller said, ' Cut it out! cut it out!' is a fair sample. That of the committee's talk with Grabowsky, and of Johnson's talk with him, the talk with Hamacher, the talk of Bink with John Groos, the talk of Crose with witness Fred Olson, and of Cleary with Howell, in

which Cleary told Howell, when spoken to about the boy-cott of the Journal, that 'the less he said about those things the better,' are all to the same end, and go to show a combination and concert of action to interfere with the business of the complainant in an unlawful manner, and in a way contrary to public policy.

" I do not find from the evidence that there was any combination or conspiracy against complainant which took concert of action prior to the meetings of January, 1908. I am satisfied that the society or association known as the ' K. Y. M. S.' was not formed until August, 1908. It was this combination of January, 1908, which in my judgment constituted the conspiracy. It is a familiar doctrine that—

" 'Where two or more persons enter into a conspiracy, any act done by either in furtherance of the common design, and in accord-ance with the general plan, becomes the act of all, and each con-spirator is responsible for such act.'  8 Cyc., p. 657.

" This is true, even though the results were not specifi-cally intended or the means specifically agreed upon.  A combination formed for the purpose of injuring a person in his trade or occupation has been held to constitute an indictable offense.  6 Am. & Eng. Enc. Law (2d Ed.), p. 861. It is probably true, as stated by the defendants when testifying, that the word 'boycott' was not used by them or by the meeting.  While this is probably true, yet no fair-minded man can read the testimony in this case and the affidavits in evidence without reaching the con-clusion that there was here a combination to interfere with the legitimate business of the complainant in a man-ner that was clearly unlawful and against public policy.

" But it is urged that, even if the facts are as claimed by the complainant and are true, there were no threats or acts tending to intimidate or coerce any of the patrons of the complainant.  But to this proposition I cannot agree. When Wilkinson was told that 'it was up to him,' and when Miller told Lohmiller to 'cut it out,' and when parties were refused accommodations because they adver-tised with the complainant, and especially when, by con-cert of action, a large number of persons are acting along the same lines, there can be no doubt as to what was meant, nor as to what was intended by the defendants.

" 'The law abhors subterfuges. It lays aside the covering and looks to the actual facts beneath.'

" 'Threats in language are not the only threats recognizable in the law. Covert and unspoken threats may be just as effective as spoken threats.'

" 'It is sufficient to justify the finding of a conspiracy, if it is shown that the persons charged with conspiracy pursued by their acts the same object, often by the same means, one performing one part of the act and the other another part of the same act, so as to complete it, with a view to the attainment of the object which they were pursuing.'

" Upon the law of the case much might be said, as applicable to the facts here. Can there be any question that the acts of the defendants were intended to cripple the business of the complainant, by cutting off custom and patronage ? If so, then such concert of action constituted a boycott.

" A 'boycott,' as generally understood, is held by nearly all the authorities to be an unlawful conspiracy, and subject to restraint by a court of equity. It may be defined to be a combination of several persons to cause a loss to a third person by causing others against their will to withdraw from him their beneficial business intercourse through threats that, unless a compliance with their demands be made, the persons forming the combination will cause loss or injury to him; or an organization formed to exclude a person from business relations with others by persuasion, intimidation, and other acts which tend to violence, and thereby cause him, through fear of resulting injury, to submit to dictation in the management of his affairs. Such acts constitute a conspiracy, and may be restrained by injunction. *Crump* v. *Commonwealth*, 84 Va. 927 (6 S. E. 620, 10 Am. St. Rep. 895); *Toledo, etc., R. Co.* v. *Pennsylvania Co.* (C. C.), 54 Fed. 730 (19 L. R. A. 387); *Barr* v. *Essex Trades Council*, 53 N. J. Eq. 101 (30 Atl. 881); *State* v. *Stewart*, 59 Vt. 273 (9 Atl. 559, 59 Am. Rep. 710); *Gatzow* v. *Buening*, 106 Wis. 1 (81 N. W. 1003, 49 L. R. A. 475, 80 Am. St. Rep. 1); *Casey* v. *Cincinnati Typographical Union No. 3* (C. C.), 45 Fed. 135 (12 L. R. A. 193); *Frank & Dugan* v. *Herold*, 63 N. J. Eq. 443 (52 Atl. 152).

" In *Hopkins* v. *Stave Co.*, 83 Fed. 912, 28 C. C. A. 99, Judge Thayer, speaking for the court of appeals of the eighth circuit, said:

" 'The courts have very generally condemned those combinations usually termed "boycotts," which are formed for the purpose of

interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them, by means of threats and intimidation, of the right to conduct the business in which they happen to be engaged according to the dictates of their own judgments.'

"In the case of *Moores & Co.* v. *Bricklayers' Union*, 10 Ohio Dec. (reprint) 665, 23 Wkly. Law Bul. 48, it appears that a labor union became involved in some controversy with one Parker concerning various matters, and, in order to bring Parker to their terms, the union notified materialmen that any one selling to him would be boycotted. Moores, plaintiff in the action, persisted in selling to Parker, notwithstanding this notice, and the union promptly notified all of Parker's customers or prospective customers that none of its members would work Moores' material, thereby causing serious damage to the business of Moores. There were no acts or threats of violence shown, but the court held that the acts of the members of the union amounted to an unlawful conspiracy, and a recovery against them was upheld.

"While the question of boycott was not involved in the case of *Ertz* v. *Produce Exchange*, 79 Minn. 140 (81 N. W. 737, 48 L. R. A. 90, 79 Am. St. Rep. 433), the principles of the law applicable thereto were involved and discussed by the court. It was there held, upon facts showing that a dealer in farm produce had established a profitable business, that defendant conspired to induce others not to deal with him, it not appearing that their interference with his business was to further any legitimate interests of their own, but done maliciously to injure him; that it was a conspiracy, and actionable. The court there said:

"'But one man singly, or any number of men jointly, having no legitimate interests to protect, may not lawfully ruin the business of another by maliciously inducing his patrons and third parties not to deal with him.'

"What amounts to coercion, intimidation, or threats of injury must necessarily depend upon the facts of each particular case. *Plant* v. *Woods*, 176 Mass. 492 (57 N. E. 1011, 51 L. R. A. 339, 79 Am. St. Rep. 330); *Sherry* v. *Perkins*, 147 Mass. 212 (17 N. E. 307, 9 Am. St. Rep. 689).

"In *Barr* v. *Essex Trades Council*, *supra*, it was said:

" 'The clear weight of authority undoubtedly is that a man may be intimidated into doing, or refraining from doing, [a particular act] by fear of loss of business, property or reputation as well as by dread of loss of life, or injury to health or limb; and the extent of this fear need not be abject, but only such as to overcome his judgment, or induce him not to do, or to do, that which otherwise he would have done or have left undone.'

"Intimidation, within the meaning of the law, is not necessarily limited to threats of violence to person or property. A combination between persons merely to regulate their own conduct of affairs is allowable, and a lawful combination, though others may be indirectly affected thereby; but a combination to do injurious acts, expressly directed to another by way of intimidation or constraint, either of himself or of persons employed, or seeking to be employed by him, is outside of allowable competition and unlawful. *Vegelahn* v. *Guntner*, 167 Mass. 92 (44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443). The interference is held by many of the authorities to be unlawful, although it does not affect existing contract relations. The wrongful interference with one's business and prospective customers is as much an infringement of his rights, as though contractual relations actually existed and were interfered with. *Jersey City Printing Co.* v. *Cassidy*, 63 N. J. Eq. 759 (53 Atl. 230); Addison on Torts, p. 7.

"In restraining boycotts, the authorities proceed on the theory that they are unlawful interferences with property rights. The Constitution of our State guarantees liberty to every citizen, and a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property, or character; and the rights so guaranteed are fundamental, and can be taken away only by the law of the land, or interfered with, or the enjoyment thereof modified, only by lawful regulations adopted as necessary for the general public welfare.

"As remarked by Judge Bradley in the *Slaughter House Cases*, 16 Wall. (U. S.) 36–116:

" 'For the preservation, exercise, and enjoyment of these rights the individual citizen, as a necessity, must be left free to adopt such calling, profession, or trade as may seem to him most conducive to that end. * * * This right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, when chosen, is a man's property and

right. Liberty and property are not protected where these rights are arbitrarily assailed.'

"A person's occupation or calling, by means of which he earns a livelihood and endeavors to better his condition, and to provide for and support himself and those dependent upon him, is property within the meaning of the law, and entitled to protection as such. Persons may organize and persuade and induce others to join them, but when they resort to unlawful means to cause injury to others with whom they have no relations, contractual or otherwise, the limit permitted by the law is passed, and they may be restrained. *Gray* v. *Trades Council*, 91 Minn. 171 (97 N. W. 663, 63 L. R. A. 753, 103 Am. St. Rep. 477).

"But we need not go outside of our own decisions to find ample support for the doctrine already stated. In *Beck* v. *Protective Union*, 118 Mich. 497, 519 (77 N. W. 13, 21, 42 L. R. A. 407, 74 Am. St. Rep. 421), it was held that injunction would lie to restrain a combination of persons from attempting to ruin complainant's business, by bringing to bear upon his customers and employés intimidating and coercive means, though the acts were unaccompanied by actual violence or threats of violence. On p. 519 Mr. Justice GRANT, speaking for the court, said:

"'The law abhors subterfuges. It lays aside the covering and looks to the actual facts beneath. In the language of Chief Justice Shaw: "The law is not to be hoodwinked by colorable pretenses; it looks at truth and reality, through whatever disguise it may assume." *Com.* v. *Hunt*, 4 Metc. (Mass.) 111, 129 (38 Am. Dec. 346). Threats in language are not the only threats recognized by the law. Covert and unspoken threats may be just as effective as spoken threats.'

"There would seem to be no doubt that the defendants, constituting the committee, by their language and conduct in their interview with Salinsky and Wilkinson and other parties, as disclosed by the evidence, intended in an emphatic manner to convey to them, as customers of complainant, that they would be boycotted, unless they ceased to trade or do business with complainant. See, also, numerous authorities cited in the last-named case to the effect that no violence or threats of violence need be used in order to establish liability.

" ' The law sanctions only peaceful means, which leave every one to the exercise of his own free will. The boycott condemned by the law is not alone that accompanied by violence and threats of violence, but that where the means used are threatening in their nature, and intended and naturally tend to overcome, by fear of loss of property, the will of others, and compel them to do things which they would not otherwise do (*Beck* v. *Protective Union, supra*).'

" See, also, *Ideal Manfg. Co.* v. *Ludwig*, 149 Mich. 133 (112 N. W. 723, 119 Am. St. Rep. 656).

" Under the evidence there can be no doubt that the defendants, constituting the committee, carried out, and acted in accordance with the instructions of the meeting of January, 1908. The conspiracy was formed at the meeting. All of those who were present and acting in concert with the project of the meeting were equally guilty with the committee. The evidence shows that all who were present and acting in concert in the appointing of this committee, and acquiescing therein, were equally guilty. I think this applies to all of the defendants except Menasip Perron. From a careful reading of the testimony, I conclude that during the time this defendant was present no action was taken looking to the appointment or raising of this committee. He was present but a few minutes, and he spoke upon the subject of the saloon keepers obeying the law, and upon this subject only. While the defendants Cleary and Crose do not appear to have been present at the entire session, yet, by their sanction and participation in the proceedings leading up to the appointment of the committee, they seem to have acquiesced in the project and to have given to it their support. Their subsequent conduct seems to have been wholly consistent with this view of the case, and with no other view.

" Upon the subject of damages, it seems to be well settled in this State that equity, having once acquired jurisdiction, will retain it, to give such full relief as will finally dispose of the controversy. The complainant was by his bill entitled to an injunction. The court had jurisdiction. It should retain it to give relief by way of damages, and thus avoid a multiplicity of suits. See cases cited in *Hall* v. *Nester*, 122 Mich. 146 (80 N. W. 982).

" I am unable to agree with complainant's solicitor as to the amount of damages sustained by the complainant by reason of the conspiracy, as shown by the evidence.

The withdrawal of business by a number of the parties is not traceable to the conspiracy or the acts following it. The loss occasioned by the withdrawal of the business of the witness Salinsky is the most tangible and the largest in amount. After a careful reading of the evidence upon this subject and taking into consideration that these damages which the plaintiff has suffered have been continuing, and may continue for an indefinite period, and that the acts of the defendants which are complained of have been wilful and oppressive, I am constrained to fix the damages of the complainant at the sum of $1,000.

"The bill of complaint as to Menasip Perron will be dismissed, with costs. A decree will be entered as to the other defendants, restraining them as prayed for in the bill, and ordering that they pay to the complainant the sum of $1,000 damages, with costs of suit to be taxed, and that complainant have execution for the same."

The judgment is affirmed, with costs.

BIRD, HOOKER, MOORE, and MCALVAY, JJ., concurred.