[No 1736.]

## L. C. BRANSON, APPELLANT, *v.* THE INDUSTRIAL WORKERS OF THE WORLD, ET AL., RESPONDENTS.

1. DISMISSAL AND NONSUIT—GROUNDS—MOTION—COMBINED MOTIONS—GRANT OR REFUSAL. Where no specific provision is made in the statutes for a combined motion to strike the complaint, to vacate the summons, annul all the proceedings in the cause and dismiss the action, such motion cannot be granted unless the moving party is clearly entitled to the relief asked for, and the pleading cannot be amended so as to cure the defects complained of.

2. ASSOCIATIONS—ACTIONS AGAINST—PARTIES. In equity, an action may be instituted by or against a voluntary unincorporated organization where the members comprising the same are numerous by simply joining as defendants a few natural persons, members of the organization, sufficient to represent and protect the interests of the entire membership, and the few may be made plaintiffs or defendants for all.

3. ACTION—LEGAL OR EQUITABLE NATURE—ABOLITION OF DISTINCTION—CODE PROVISIONS. Under the Code of Nevada, there is but one form of civil action, and legal and equitable distinctions so far as practice is concerned are largely, if not entirely, done away with.

4. ASSOCIATIONS—MULTIPLICITY OF PARTIES—EQUITY RULE IN CIVIL ACTION. Since it was the intention of the legislature by section 14, civil practice act (Comp. Laws, 3109), providing for the joinder of parties as plaintiffs or defendants, where the parties are numerous and it is impracticable to bring them all before the court, and to permit one or more to sue or defend for the benefit of all, to make the equity rule as to the joinder of parties available in an action at law, in an action against voluntary associations, it is proper to sue the associations as such and join a few natural persons, members of the association, to represent all the members.

5. MOTIONS—RELIEF GRANTED—REMEDY BY DEMURRER. Under Comp. Laws, 3135, authorizing a demurrer to a complaint for a defect or misjoinder of parties defendant, and under section 71 of the practice act (Comp. Laws, 3166), authorizing the court to disregard errors not affecting the substantial rights of the parties, it is error in an action against a vol-

untary unincorporated association in which are joined a few natural persons, members of the association, to represent all the members, to grant a portion of a combined motion to strike the complaint, to vacate the summons, annul all the proceedings in the cause and dismiss the action, by dismissing only as to the association as such, since the court, not being able to grant the relief asked, should have denied the motion *in toto* and left the parties to their remedy by demurrer.

6. ASSOCIATIONS—MEMBERS—ATTACHMENT—AFFIDAVITS—PARTIES. Where, in an action against a voluntary unincorporated association, a few natural persons, members of the association, are made parties to represent all the members, an affidavit for an attachment in the action, good against the natural persons made parties, is good against all the members of the association.

7. CONSPIRACY—CRIMINAL RESPONSIBILITY—ENTICING SERVANTS. Neither at common law nor under statutes modifying the common-law doctrine is it lawful for workmen to combine to injure another's business by causing his employees to leave his services by intimidation, threats, molestation, or coercion, and such a combination constitutes an indictable conspiracy.

8. WORDS and PHRASES—"BOYCOTT." The term "boycott" ordinarily means a confederation, generally secret, of many persons whose intent is to injure another by preventing any and all persons from doing business with him through fear of incurring the displeasure, persecution, and vengeance of the conspirators.

9. ATTACHMENT — AFFIDAVITS — CRIMINAL ACTS — BOYCOTT — ASSOCIATIONS. Where, in an action against voluntary unincorporated associations and their members for damages for injuries to plaintiff's business by boycott, etc., an affidavit for attachment alleges in the words of Comp. Laws, 3218, that defendants criminally incurred the damages for which suit has been commenced, and in addition, makes the complaint part of the affidavit, which complaint alleges in substance that the defendants combined together to injure plaintiff's business by threats, boycott, and the like, and the use of violence, setting out specific acts which were alleged to be unlawful, and that the reason for their action was the refusal of plaintiff to accede to the demands of defendants, that plaintiff compel his employees, who were union men and to whom he paid union wages, to join a rival labor organization, the affidavit states a good cause of action for an attachment on the ground of criminally incurring the damages sued for, since the allegations of the complaint show that there was not a peaceable coöperation of the employees to better their condition by securing an advance in wages or in fixing the hours of labor as expressly authorized by Comp. Laws, 4751, and the acts in themselves show a criminal conspiracy.

10. SAME. *Held*, also, that it was not necessary that all the specific acts alleged to have been committed in pursuance of the conspiracy be in themselves of a criminal nature, or that it be determined whether each and every specific act is unlawful.

11. APPEAL—REVIEW—QUESTIONS CONSIDERED—ACADEMIC QUESTIONS. Where, in an action against a voluntary unincorporated association and its members for damages to plaintiff's business by a conspiracy to boy-

cott, an appeal is taken by plaintiff from an order dismissing the action against the association as such, the fact that property was wrongfully taken by the sheriff under a writ of attachment sued out in the action cannot be reviewed on the record presented.

APPEAL from the District Court of the Third Judicial District, of the State of Nevada, Nye County; *Peter Breen*, Judge.

Action by L. C. Branson against the Industrial Workers of the World, and others, for damages caused by a conspiracy to boycott and injure plaintiff's business. From an order dismissing the complaint as against part of the defendants, plaintiff appeals. **Reversed and remanded.**

The facts sufficiently appear in the opinion.

*L. A. Gibbons* and *Wm. Forman*, for Appellant:

I. The court erred in dismissing the action. If the complaint failed to state a cause of action against said defendants, their only legal method of reaching the defect was by a demurrer on the ground that the complaint did not state facts sufficient to constitute a cause of action as to them. It is only where a sole plaintiff or a sole defendant is incapable of suing or being sued that dismissal of the action is proper. A voluntary unincorporated society is liable for its torts to the extent of its property, and can be sued for such torts. It may be sued in its own name, and brought within the jurisdiction of the court by service of process upon its officers; or several of its members may be sued for all of its members. This last remedy is as old as equity itself. In the present case both methods were pursued.

II. Section 3218 of the Compiled Laws provides that an attachment may issue where the defendant has criminally incurred the obligation for which suit is brought. One criminally incurs an obligation when the obligation is created by a crime committed by him. The matters and things alleged in the complaint to have been committed by the defendants were crimes at common law. Comp. Laws, 4788, provides that those acts which were crimes at common law are crimes in this state. Therefore the obligation for which this suit is brought herein was criminally incurred.

*P. M. Bowler*, for Respondents:

I. The law is that an unincorporated, voluntary associa-
tion having no existence apart from and separate from those
who compose it, suit cannot be maintained against such
association by its common name, nor can its common funds
be held for the acts of its members. The action must pro-
ceed against the individual members in their individual
capacities wherein each are jointly and severally liable and
their property amenable. (*Mexican Mill* v. *Yellow Jacket M.
Co.*, 4 Nev. 40.)

II. Having a precedent for the procedure taken in this
matter by this honorable court, guided and controlled by the
reasoning in the Mexican Mill case, *supra*, we have acted,
and so has the lower court. We maintain we were authori-
tatively justified in raising the point by motion to dismiss,
and not by demuring, for the demurrer would not lie. The
plaintiff starts out by making the Industrial Workers of the
World, Tonopah Miners' Union No. 121, Tonopah Branch,
Goldfield Miners' Union, Goldfield Branch, Mining Depart-
ment, Industrial Workers of the World, Newsboys' Union
No. 45, Industrial Workers of the World, defendants, then he
proceeds, naming Herbert T. Shaw as president of the Tono-
pah Branch I. W. W., etc., as well as to name other parties
as officers of the other unions, but it is clear that the unions
named are made defendants by their common name just the
same as if they had a legal entity. This the law does not
permit. (*Richardson* v. *Smith*, 21 Fla. 336; *Scheutzen Bund*
v. *Agitations Verein*, 44 Mich. 313; *Danbury Cornet Band*
v. *Bean*, 54 N. H. 524; *Mayer* v. *Journeyman Stonecutters'
Association*, 47 N. J. Eq. 519; *Nightingale* v. *Barney*, 4
Iowa, Greene, 106.)

III. The attachment should be discharged on account of
the insufficiency of the affidavit on attachment, in that it is
not shown thereby that defendants, or either of them, crim-
inally incurred the obligation for which judgment is sought.
The office of an affidavit is generally to set forth facts, evi-
dential, probative facts, as contradistinguished from ultimate
facts or conclusions of law, and when the ground of attach-
ment is a single and complete fact, substantive in its nature,

and not dependent on associate facts or circumstances to establish its existence, it will be sufficient to state that ground in the words of the statute, but when the ground consists of an act done in a manner or for a purpose which makes the act obnoxious to good morals, and that act, thus united to the purpose, is described in the statute only by words of legal import implying conclusions of law from stated facts, then the bare recital of the words of the statute will not suffice. Of this type is the ninth statutory ground of attachment. To say that an obligation is criminally incurred is a statement of a conclusion of law. The statute in effect says that when acts are done in a manner and for a purpose which in law amounts to a crime, or, in other words, if in the perpetration of a crime an obligation is incurred, an attachment may issue upon affidavit showing the criminality. The criminal incurring of an obligation is not a single fact, substantive in its nature, but is dependent on associate facts and circumstances to establish its existence. (*First National Bank* v. *Swan*, 23 Pac. 744; *Volmer* v. *Spencer*, 51 Pac. 609.) The proceeding by attachment which obtains in Nevada is a summary and extraordinary remedy in derogation of the common law, and owes its existence entirely to statutory enactment. While heroic, drastic and remedial it is nevertheless privileged, and one desiring the benefit to be derived therefrom must be held to at least a substantial compliance with statutory requirements. It is the universal rule that a plaintiff in order to have the benefit of this statutory provisional remedy must do everything required by the statute. (Vol. 4, Cyc. p. 396 and notes, p. 400; *Rudolph* v. *Saunders*, 43 Pac. 619.)

IV. The complaint does not state facts sufficient to constitute a cause of action legal or equitable, and does not entitle plaintiff to any relief whatever. Does the affidavit show that defendants criminally incurred the obligation for which suit is commenced? This involves the sufficiency of the complaint which forms part of the affidavit for attachment. It is a common practice with some lawyers in drawing complaints for damages and injunctive relief to indulge extravagantly in the indiscriminate and reckless use of adjectives, with the intention, presumably, by force of their ominous

and portentous meaning, to overwhelm the mind and cloud the judgment of the court. The plaintiff's complaint, in this respect, is no exception, for in it we find "unlawfully," "wantonly," "wilfully," "wrongfully," "maliciously," "wickedly," "coercion," "force," "intimidation," "threat," "threatened," "combined," "conspired," "conspiracy," and the like, without acts or events being described, and unaccompanied with any specific statement of facts or circumstances, which can or would enable the court to determine whether an alleged thing was done so as to fit into the adjectives set forth. Such words have in themselves no inherent character or unlawfulness. They are high sounding, but contain no element of fact to make defendants or any of them stand charged with any crime or wrong-doing. (*Davitt* v. *American Bakers' Union*, 124 Cal. 100.)

V. Paragraph II charges the officers and members of the I. W. W. and its branches with being bound and tied together in all matters affecting their common interests, including the ordering, production, and furtherance of strikes and boycotts. Yet there is no showing or specific statement of facts that there ever was a resolution of any of the unions respecting a boycott or strike, but if such should appear, notwithstanding the absence of such averment, that is no more than the exercise of a lawful right. No coercion was inflicted or imposed upon the members. From everything that is shown it was a matter of mutual understanding and agreement, which was and is a subject of lawful concern to them alone. It cannot be successfully maintained under the statute of this state defining the crime of conspiracy that it is unlawful or illegal for persons employed in any profession, trade, or handicraft to orderly and peacefully assemble, or the coöperation of such persons for the purpose of securing an advance in the rate of wages or compensation for the maintenance of the same. To exact or demand that plaintiff employ none but members of the I. W. W. or unionize his office by having his men become members of such organization is a step in the line of maintenance of the union scale of wages, for such is the measure of their obligation to each other by special agreement and common consent. No coercion upon them is

thereby shown. By virtue of the provisions of the statute of this state, *supra*, that statute shall not be construed in any court of this state to restrict or prohibit peaceable strikes and boycotts; upon the contrary the intent and very purpose of that statute as it has existed since 1887 is to authorize peaceable assemblage and coöperation for such strikes and boycotts, which prior to such amendatory statute was unlawful and illegal, however orderly and peaceably conducted. This statute prior to such amendment was simply declaratory of the English common law, and this amendatory statute, being in derogation of the common law, nullifies and renders obsolete the common law and all decisions of courts predicated upon common-law principles.

VI. The complaint, when divested of its prolific use of adjectives, conclusions of law, subterfuge and legal verbiage, amounts to no more than that the Tonopah and Goldfield Miners' Unions and the Newsboys' Union of Goldfield affiliated with the I. W. W. agreed to compel the plaintiff and appellant to submit to their request that he unionize his printing office, by the employment of none other than those affiliated with the I. W. W. upon pain of being boycotted in business; that he refused their demand; a strike was ordered, men and boys quit his establishment and his employment; that the boycott was waged, a circular was printed and circulated, declaring that plaintiff was unfair, by the Newsboys' Union, affiliated with the I. W. W; that in consequence he lost subscribers to his papers, advertisers and job printing; that the friends of organized labor and the labor organizations withdrew their patronage from him, resulting in financial loss estimated at twenty-five thousand dollars, for which he brings this action and attaches the funds and hospital of the Tonopah Union. This is all there is of the complaint. That the Newsboys' Union or the I. W. W. had the unmistakable right to request of him, as they did, cannot be doubted; he had the privilege to do as he pleased in the matter; he saw fit to become obstinate and refused the requisition made upon him; a peaceable boycott ensued, resulting in his financial loss. Employees have absolute rights which, in their industrial relations, are available and which they should enjoy, namely: To organize

into unions, societies, associations, or by whatever name, for their mutual benefit; to combine with a view of securing employment for themselves to the exclusion of others not in concert with them. The fight for supremacy among labor unions to control the labor market is not unlike the struggle between political parties for governmental control. The right of workmen to combine to obtain employment, with a view of getting as much as they can for their labor, is absolute, just as the capitalists combine to obtain the highest possible return for their money. This right for a long time was denied; it was slow of recognition, but with the progress of civilization it has come to be law and is here to stay.

VII. A benevolent or social club, association, or miners' union is not a partnership in any sense of that term. The miners' union is, as the complaint alleges, an unincorporated association for the mutual benefit of its members, among which are sick benefits, allowance for burial of the dead, and care of the afflicted of its membership, a sort of social and benevolent arrangement not for gain or pecuniary profit. The union or association funds are not liable for the individual torts of its members. The members of such an institution are liable, if liable at all, for the acts of their associates on the ground of principal and agent, and not of partnership, and it requires no vivid imagination to recognize that for individual torts the entire association or membership and its funds cannot be held for the individual torts of its members. (Bates on Part. 75; Lindley on Part. 50; Story on Part. 144; *Flemming* v. *Hictor*, 2 Mees. and W. 172; *Ash* v. *Gine*, 97 Pa. St. 493; *Ermautraut* v. *Robinson*, 54 N. W. 188.)

*L. A. Gibbons*, for Appellant, in reply:

I. It is alleged in the complaint that the voluntary associations are composed of persons voluntarily "combined and associated together for their own common benefit, and governed by officers and agents selected by the members of said respective associations." It is next alleged that certain individual defendants were at all times the presidents and secretaries of the associations. Here are distinct allegations that the associations are governed by officers selected by the mem-

bers themselves, and these officers are made parties defendant. In other words, not alone are the associations made parties defendant, but the governing officers of those associations. Counsel says: "If such officers could be sued at all, it would be under some designation, for instance, like this: 'Herbert T. Shaw, representing an association of individuals stvling themselves as Tonopah Branch of the Industrial Workers of the World.'" Has not the pleader alleged this in effect and, moreover, as a fact instead of in a recitative form? It is alleged that the associations are governed by certain officers, those officers are named and they are sued as such officers, for it will be noted that the individuals named as officers are sued not alone as individuals, but as officers. It may be admitted that there is no law here that permits a voluntary association to be sued in its common name, but, when admitted, of what import? The present is not such a case. This is a suit in equity. The voluntary associations were composed of large numbers of persons; members of each association were made parties defendant. This complies with the old equity rule, older than the jurisprudence of the United States itself. (See 15 Ency. Pl. & Pr. p. 608, and cases cited.) That is particularly the rule in actions against voluntary associations. (22 Ency. Pl. & Pr. p. 247.)

II. That a voluntary association is liable for the acts of its members while pursuing the objects of the association where those acts. cause injury to others is too well settled to admit of discussion. (*Employing Printers Club* v. *Dr. Blosser Co.*, 69 L. R. A. 90; *Ertz* v. *Produce Exchange*, 81 N. W. 737; *Simmons* v. *Southern Rifle Club*, 52 La. Ann. 114; *April* v. *Bird*, 32 N. Y. App. 2261.)

III. Upon filing an affidavit in the statutory language its issuance can be compelled. The clerk is not concerned with the question as to whether the plaintiff will prove his case, nor does he at all pass upon that question when he issues the writ. Yet, if counsel's contention be correct and the facts must be stated and not the legal conclusion in the language of the statute, is he not then compelled to pass upon a legal question, viz: Is the legal conclusion deducible from the

facts stated? In other words, counsel's contention would make the clerk a judicial officer, while under the statute he is only a ministerial officer. But as a copy of the complaint is made a part of the affidavit, the affidavit states sufficient facts if the complaint does.

IV. Counsel seems to be surprised that intent should be a factor in the case, yet is not intent the very gist of all crimes? Does it not constantly change innocent acts into graver crimes? I have a right to place refuse upon my own grounds, yet it is unlawful for me to do so when I know it will poison a neighbor's well and place the refuse there for that very purpose. Counsel says respondent has the right to criticise. They assuredly have that right, but granting them that right does not take away from the criticised all right. I have a right to criticise an actor or a play, my friends have the same right, yet if the actor be an enemy of ours have we the right to go to the theater and for the purpose of injuring that actor, by hissing and noise, prevent him from continuing his performance? Assuredly not. (*Gregory* v. *Brunswick*, 6 M. & G. 205.)

V. The acts complained of were crimes at common law. (*State* v. *Glidden*, 55 Conn. 46; *People* v. *Kostka*, 4 N. Y. Crim. 429; *Crump* v. *Commonwealth*, 84 Va. 927; *State* v. *Stewart*, 59 Vt. 273.) And being crimes at common law they are such in the State of Nevada. (Comp. Laws, 4788.)

*Per Curiam:*

This is an action brought by the plaintiff and appellant against various voluntary unincorporated labor organizations—such organizations being designated in the complaint by their respective names—against the president and secretary, respectively, of each of said organizations, both in their official and individual capacity; also against a number of other persons, members of said organizations. At the time of the filing of the complaint a writ of attachment was obtained upon an affidavit, reciting that the ground of attachment was that "defendants criminally incurred the obligations for which the suit has been commenced." In the affidavit for attach-

ment a copy of the complaint was set out in full, and made a part thereof.

The complaint, briefly epitomized, alleged that plaintiff was the owner and publisher of two certain newspapers published in the State of Nevada, to wit, the Tonopah Daily Sun, published at Tonopah in Nye County, and the Goldfield Daily Sun, published at Goldfield in Esmeralda County; that plaintiff had invested more than $27,500 in said two newspapers, and the plants connected therewith, and that he was dependent upon the public for the support and patronage of the same; that plaintiff in the publishing of said newspapers employed only "union" men and paid them "union" wages; that the defendants demanded of plaintiff that he require his employees to become members of the defendant organization, the Industrial Workers of the World, and upon plaintiff's refusal so to do, the defendants, and each of them, entered into a conspiracy to damage, injure, and ruin plaintiff's business and interest in said two newspapers, by means of boycotts, threats, intimidation and violence; that in pursuance of said conspiracy, defendants are charged in the complaint with specific acts of violence, threats and intimidation, as follows:

"(1) That on the 3d day of August, 1906, defendants caused and procured a strike of the newsboys or those who delivered and sold the Goldfield Daily Sun in Goldfield, Esmeralda County, Nevada, and that said newsboys thereupon struck and refused to sell or deliver said the Goldfield Daily Sun; that thereupon plaintiff employed one H. C. Farmer, and Everett Read to deliver his said papers, and thereupon said defendants caused said parties to be physically assaulted and called 'scabs' and other opprobrious names, and by violence and intimidation prevented said parties from delivering said paper, and by said means, and others hereinafter set forth, plaintiff has been and is prevented from delivering his said papers in Goldfield.

"(2) The defendants issued and caused to be distributed a circular throughout Goldfield, and sent the same to the customers and subscribers of plaintiff, in which circular plaintiff, the Goldfield Daily Sun, was declared unfair.    *    *    *

And the public was asked and commanded not to buy said paper or in any way patronize the same.

"(3) That defendants visited all advertisers who advertised in the Goldfield Daily Sun, and falsely stated to all said advertisers that said paper was unfair, and.that defendants had boycotted the same, and demanded of said advertisers that they cease to advertise in said the Goldfield Daily Sun, and threatened said advertisers that if they continued to advertise in said the Goldfield Daily Sun any advertiser so doing would be boycotted by defendants.

"(4) That said defendants demanded of the public in general that they not subscribe for, advertise in, or in any way patronize the Goldfield Daily Sun, and threatened any one who did so with boycott by defendants.

"(5) That defendants visited all the news stands in Goldfield where the Goldfield Daily Sun was sold or dealt in, and threatened each and all of said news stands with a boycott at the hands of defendants, and that defendants would post any news stand selling the said the Goldfield Daily Sun as 'unfair' and a 'scab,' unless said news stand ceased absolutely to sell or handle said paper. That one of said news stands was owned by one of plaintiff's employees, and that defendants by the use of said threats and intimidations forced and compelled said employee not alone to cease selling or handling the said the Goldfield Daily Sun, but also quit the employ of plaintiff; and that said employee of plaintiff was forced to accede to the demands of defendants through fear that defendants would ruin his business unless he did comply with their demands.

"(6) That defendants maintained a blackboard or billboard on the public streets of Goldfield in front of the Miners' Union Hall, on which blackboard or billboard they caused to be posted the names of all those who advertised in the Goldfield Daily Sun, and in connection with the names of said advertisers so posted stated that 'the Goldfield Daily Sun had been declared unfair,' and asked the public not to patronize those persons or firms or corporations whose names appeared upon said blackboard or billboard for the reason that they advertised in the Goldfield Daily Sun; that by reason of said

acts of defendants all advertisers save five, whose names were posted on said blackboard, were forced to and did withdraw their advertisements from the Goldfield Daily Sun.

" (7) That defendants established an espionage upon the office of the Goldfield Daily Sun and watched all persons who entered into the office of the said paper, and that by reason of the threats of a boycott and intimidation forced and compelled many persons to cease to patronize the job printing department of the Goldfield Daily Sun, and in many cases forced and compelled customers to cancel orders for work given to said paper, even after the work had been completed by plaintiff.

" (8) That defendants combined and conspired with the employees of the Tonopah-Goldfield Railroad Company who handle freight and with the transfer companies operating in Goldfield, whereby said railway employees and said transfer companies agreed not to in any way handle, deliver, or forward any of the freight sent by or to plaintiff or the Goldfield Daily Sun, and that by reason of said combination and conspiracy said railway employees have refused to handle or unload freight sent to or by the Goldfield Daily Sun, and the transfer companies have refused to handle in any way freight sent to or by the Goldfield Daily Sun, and that as a direct result of said combination and conspiracy plaintiff is unable to receive or ship any freight unless his own employees receive the same at the cars or deliver the same to the cars for shipment.

" (9) That defendant organizations have enforced their said boycott against plaintiff and his paper the Goldfield Daily Sun and the Tonopah Daily Sun, and has compelled its members to enforce said boycott by placing a fine of $15 upon any member who bought a copy of either paper.

" (10) That the defendant organizations have directed and ordered all their members to withdraw their subscriptions from the Tonopah Daily Sun under a penalty of a fine by or a dismissal from said organizations.

· " (11) That defendants have persuaded and endeavored to compel those who sell and deliver the Tonopah Daily Sun to strike and refuse to sell said paper or to deliver the same

to its subscribers, and in pursuance of said conspiracy and combination have offered to pay said newsboys, and those who deliver and sell said the Tonopah Daily Sun, $1.50 per day if they would strike and refuse to sell or deliver said newspaper.

"(12) That said defendants have caused by threats and intimidation the newsboys, and those who sell and deliver the Tonopah Daily Sun in Manhattan, Nye County, Nevada, to strike and refuse to sell or deliver said the Tonopah Daily Sun, and thereby greatly decrease the circulation of said paper, and prevented plaintiff from obtaining new subscribers.

"(13) That defendants or their agents have visited the newsdealers in Tonopah, Nye County, handling or selling the Tonopah Daily Sun, and demanded of them that they cease selling or handling the Tonopah Daily Sun, and threatened them that if they did not do so that they, the defendants, would boycott the newsdealers continuing to handle said the Tonopah Daily Sun.

"(14) That defendant Shaw entered the office of the plaintiff in Tonopah, and attempted by threats and intimidation to compel plaintiff to submit to the demands of the defendants, and persisted in his said threats and intimidations until it became necessary to eject him from plaintiff's said office.

"(15) That defendants have demanded that advertisers in the Tonopah Daily Sun withdraw their advertisements from said paper, and have threatened that unless they did so defendants would boycott them, and that as a result of said threats and intimidations, advertisers in said paper have withdrawn their advertisements therefrom and have ceased to advertise in said paper.

"(16) That defendants have publicly, falsely stated and caused said statement to be circulated among the public that the Tonopah Daily Sun was unfair, and that the same was published solely in the interests of the mine owners, and demanded of all persons that for these reasons they do not subscribe for or patronize said paper.

"(17) That plaintiff is informed and believes, and therefore alleges the facts to be, that defendant organization I. W. W.

and its officers plotted and planned to blow up and destroy the plant of said the Tonopah Daily Sun, and was prevented from so doing only by the vigilance of the plaintiff in guarding his said property.

"(18) That defendants for the purpose of intimidating plaintiff and preventing him from publishing his said newspaper, and for the purpose of injuring and destroying his business and his property rights in said newspapers, and for the purpose of depreciating in value thereof and forcing plaintiff to comply with their demands have repeatedly publicly stated and threatened as follows: That the boycott (against plaintiff) would not be raised until the plaintiff had sold both his newspapers, and that if plaintiff did not do so his two plants would not be worth fifteen cents. That plaintiff would have to sell his Goldfield paper, prove the sale to be bona fide, compel the employees of the Tonopah Daily Sun to join the Industrial Workers of the World, and publish in the Tonopah Daily Sun an apology to the Industrial Workers of the World. That the purchaser of the said the Goldfield Daily Sun would have to carry the so-called 'I. W. W. card' or publish a column devoted to the Industrial Workers of the World. That plaintiff could sell his business and plant in Goldfield only to the I. W. W. That they (defendants) would not let up on plaintiff until they had driven him from the State of Nevada.

"(19) The defendants caused plaintiff's employees to be assaulted while they were delivering mail to the United States postoffice or taking mail therefrom."

The complaint further alleges that as a result of the alleged conspiracy of defendants, and the acts and things done in pursuance thereof, plaintiff was damaged in the sum of $25,000, and judgment for that amount, together with costs, is prayed for against defendants.

Certain of the defendants appeared specially, and filed a notice and motion, the body of which is as follows:

"The defendants, Industrial Workers of the World, Tonopah Miners' Union No. 121, Mining Department Industrial Workers of the World, Goldfield Miners' Union No. 220, Mining Department Industrial Workers of the World, Gold-

field Branch Industrial Workers of the World, Newsboys'
Union No. 45, I. W. W., Herbert T. Shaw, as president of
the Tonopah Branch of the Industrial Workers of the World,
G. A. Roberts, as secretary of the Tonopah Branch of the
Industrial Workers of the World, J. M. Brown and Joe Smith,
respectively as president and secretary of the Tonopah Min-
ers' Union No. 121, Mining Department Industrial Workers
of the World, F. Clough and J. B. Barry, respectively as
president and secretary of the Goldfield Miners' Union No.
220, Industrial Workers of the World, L. O'Handley, and A.
Morris, respectively as president and secretary of the News-
boys' Union No. 45, I. W. W., above named appearing herein
only for the purpose of this motion, ask: That the complaint
on file herein be stricken from the files, the summons vacated,
quashed and set aside, and all and singular proceedings, so
far had and taken in said court and cause be annulled and
declared void; that plaintiff take nothing thereby, and that
said action be dismissed, and upon the following grounds:
That the said complaint does not conform to the provisions of
section 39 of the civil practice act of this state (Comp. Laws,
3134), in that the same does not specify that said defendants,
so as aforesaid, specially appearing, are thereby sued as per-
sons natural or artificial; upon the contrary, said action is
brought, and the same is pending and prosecuted against said
defendants, and each of them, as a voluntary 'unincorporated
association, composed of persons voluntarily combined and
associated together for their common benefit.' That said
complaint complains and alleges that said action is against
said defendants not as natural or artificial persons, but as an
unincorporated voluntary association or society, which is not
a legal entity, and has no existence apart from and separate
from those persons comprising said unincorporated voluntary
association. That said action is brought and pending against
said defendants in the name and names of unincorporated
voluntary associations, separate and apart from the person
and persons who compose them."

At the same time, the same defendants appearing specially,
and subject to the foregoing motion, reserving all the rights
therein claimed, moved: "That the writ of attachment issued

out of said court in said cause be vacated, quashed, set aside, dissolved, discharged, and declared void, and all and singular funds, property and money thereby seized upon and held be released and discharged therefrom upon the following grounds: That said writ of attachment was improperly issued, in this: That the affidavit upon attachment, filed in said cause, does not conform to the provisions of an act of the Legislature of the State of Nevada, entitled 'An act to amend an act entitled "An act to regulate proceedings in civil cases in the courts of justice in this state," and to repeal all other acts in relation thereto,' approved March 8, 1869; approved February 14, 1887, Stats. 1887, p. 55, c. 48; for in that said attachment was attempted to be issued on account of defendants having criminally incurred the obligation for which suit has been commenced, whereas said affidavit sets forth no fact or facts describing any criminal act or acts on the part of the defendants, or any or either of them, and contains no statement of fact or facts describing any act or acts of defendants showing the commission of any criminal act whereby said defendants, or either of them, were criminally liable, or which would subject the defendants, or any or either of them, to civil damages. That said affidavit does not contain any fact or facts showing that any acts or acts of defendants, or that any or either of them criminally incurred any obligation for which plaintiff has commenced suit, or for which plaintiff is at all entitled to recover any compensation whatsoever. That said affidavit fails to show that the nature of the plaintiff's claim is just, or that he is entitled to recover in this action. That said affidavit is wholly insufficient and does not state any fact or facts sufficient to conform to the provisions of the statute aforesaid, in that it fails to show that any debts whatever, or that the amount for which this suit is commenced, has been criminally or otherwise incurred by said defendants, or any or either of them. That said affidavit for attachment was and is wholly insufficient to give this court jurisdiction to issue the writ of attachment, for it fails to show that any liability of defendants, or any or either of them, was incurred criminally, fraudulently, or otherwise. That said affidavit does not state facts

sufficient to show the nature of the plaintiff's claim, and particularly that said claim is a just one, and that the same was criminally contracted whereby an obligation on the part of the said defendants was incurred for which this suit was commenced."

These motions coming on regularly to be heard before the trial court, the following order was made: "It is ordered that as against each and all of the voluntary unincorporated associations named and set forth in the complaint as defendants, the motion of defendants to dismiss said action and dissolve said attachment is hereby granted." From this order plaintiff appeals.

· 1. It will be observed that in the first motion quoted above it was asked, first, "that the complaint on file herein be stricken from the files"; second, "the summons vacated, quashed, and set aside"; third, that "all and singular the proceedings so far had * * * be annulled and declared void"; fourth, "that said action be dismissed." There is no specific provision in the statutes for motions of this character, and they should not be granted unless the moving party is clearly entitled to the relief asked for, and the pleadings are not capable of being amended so as to cure the defect complained of. It is manifest that the court could not appropriately grant any of the things demanded in the motion when there were any proper parties defendant. If the court had denied the motion, respondents could not have successfully assigned error, even though it be conceded that it was not proper to make voluntary unincorporated associations of persons, parties to actions merely by the name of the association. If no natural persons had been made defendants in this action, then the case would have been in the same situation as that of *Mexican Mill* v. *Yellow Jacket S. M. Co.*, 4 Nev. 40, 97 Am. Dec. 510, relied on by respondents, in which this court said: "The very first step towards the commencement of a civil action or proceeding is the filing of a complaint, in which it is indispensable that there be shown a plaintiff and a defendant, and without which it is an absolute nullity, and renders void all subsequent proceedings had under it. In this instance, no person natural or artificial is

named as a plaintiff, and if an amendment were allowed to supply the omission the effect of such an amendment would necessarily be to make a plaintiff where there were none such at the inception of the action." In this case, however, the plaintiff is a natural person, and numerous natural persons are included as defendants. While the trial court could not grant the motion in its entirety, as prayed for, it did grant it in part, by dismissing the action in so far as the voluntary unincorporated associations named and set forth in the complaint were concerned. It seems to be conceded that the effect of this order would be practically to strike from the complaint all defendants, excepting the few designated by name, while the many hundreds who compose the organizations would in no sense be parties to the action. For the purposes of this opinion, we will treat it as having such effect.

While a voluntary unincorporated association cannot by its name alone sue or be sued, nevertheless such an organization has its rights and responsibilities, which rights it may enforce by appropriate procedure; and, by the same procedure, it necessarily follows, it may be held accountable for its responsibilities. These organizations usually comprise a large membership, and are governed in accordance with prescribed rules and regulations by officers elected for the purpose. They frequently not only possess a large amount of property, but exercise vast powers in the communities in which they exist. It is conceded that they may sue or be sued by joining all their members, but this, if requisite, would impose great inconvenience upon the organizations themselves, as well as hardship upon those seeking redress against such organizations, for it would be impossible, in many instances, for nonmembers to obtain the names of more than a small fraction of the membership, without great effort, delay, and probable expense. It is manifest, we think, from the complaint, that the plaintiff proceeded upon the theory that the persons constituting the defendant organizations, being numerous, he could proceed against a few personally, who would represent the whole body of the defendant organizations. Counsel for appellant now contends that the defendant organizations are properly made defendants upon this theory. It has long been

recognized in proceedings in equity that an action may be instituted by or against a voluntary unincorporated organization, where the members comprising the same were numerous, by simply joining as defendants a few natural persons, members of the organization, sufficient to represent and protect the interests of the entire membership, and that the few may be made plaintiffs or defendants for all. (Story's Eq. Pl. 97; 15 Ency. Pl. & Pr. p. 608; 22 Ency. Pl. & Pr. p. 247; *U. S.* v. *Coal Dealers' Association*, 85 Fed. 252.)

The case of *United States* v. *Coal Dealers' Association* was a "bill by the United States against the Coal Dealers' Association of California and the members of the association, and against Charles R. Allen, Central Coal Company, R. D. Chandler, George Fritch, J. C. Wilson & Co., Oregon Improvement Company, Oregon Coal & Navigation Company, W. G. Stafford, trading as W. G. Stafford & Co., R. Dunsmuir's Sons, John Rosenfeld, Louis Rosenfeld, and Henry Rosenfeld, partners, trading as John Rosenfeld Sons."

Discussing this question, Morrow, Circuit Judge, said: "It is contended that, as the Coal Dealers' Association is an unincorporated company, it cannot be brought into court by making it a party defendant by that name. In equity, the action must be against the individuals comprising such an association; but there is this exception: Where the parties are numerous, some of them may be brought in as representing the whole association. The title of this case is against 'The Coal Dealers' Association of California, and All the Members of said Association,' and also against seventeen individuals, who are designated as 'Members and Officers of Said Association.' The return of the marshal shows that all these individuals have been served; that the president of the association has been served as an individual, and as president of the association; and he has appeared in the capacity of president in the affidavit filed by him, as has also the secretary of the association. This, I think, is sufficient, under the rule requiring sufficient parties, to represent all the adverse interests in the suit."

Were this a proceeding in equity, there would be no question about the right of plaintiff to make certain of the mem-

bers of the defendant organizations defendants for all their associates who had a common interest. This, however, is an action at law for damages, and the equity rule does not prevail unless made so by statute. Section 14 of the civil practice act of this state (Comp. Laws, 3109) provides: "Of the parties to the action, those who are united in interest shall be joined as plaintiffs or defendants; but if the consent of any one, who should have been joined as plaintiff, cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all. Tenants in common, joint tenants, or copartners, or any number less than all, may jointly or severally bring or defend or continue the prosecution or defense of any action for the enforcement of the rights of such person or persons."

We think it was the intention of the legislature, by this provision of the statute, to make the equity rule applicable to all proceedings in the courts of this state, whether the same be of a legal or equitable nature. Under our code provision, there is but one form of civil action, and legal and equitable distinctions, so far as practice is concerned, are largely, if not entirely, done away with. To hold that the defendant organizations cannot be sued without including all members, which are so numerous, scattered and difficult to ascertain might cause such hardship and delay as would amount to a denial of justice. It is hard to conceive of any case to which the statute would be more applicable in its provisions that where the parties are numerous one or more may sue or defend for all.

This question came before the Supreme Court of Ohio in the case of *Platt* v. *Colvin*, 50 Ohio St. 703, 36 N. E. 735, and we quote with approval from the opinion in that case, as follows: "It was the general rule in chancery, before the adoption of the civil code, that suits must be prosecuted by the real parties in interest, and that all who were united in interest must be joined. There were, however, certain well-

established exceptions to the rule, which, like the rule itself, were adopted for the convenient administration of justice. Among these exceptions, it is stated in Story's Equity Pleading, sec. 97, were ' (1) where the question is one of a common or general interest, and one or more sue, or defend, for the benefit of the whole; (2) where the parties form a voluntary association for public or private purposes, and those who sue, or defend, may fairly be presumed to represent the rights and interests of the whole; (3) where the parties are very numerous, and although they have, or may have, separate, distinct interests; yet it is impracticable to bring them all before the court.' In speaking of the second class of exceptions above mentioned, it is said that 'In cases of this sort the persons interested are commonly numerous, and any attempt to unite them all in the suit would be, even if practicable, exceedingly inconvenient, and would subject the proceedings to danger of perpetual abatements, and other impediments, arising from intermediate deaths, or other accidents, or changes of interest. Under such circumstances, as there is a privity of interest, the court will allow a bill to be brought by some of the parties in behalf of themselves and all the others, taking care that there shall be a due representation of all substantial interests before the court.' So that the principle upon which that class of exceptions rested is not different in substance from that of the last class mentioned, namely, that the parties are numerous, and it is impracticable, in the convenient and speedy administration of justice, to have them all before the court; and the courts in many adjudged cases appear to have so regarded it.  *  *  *  ( *Taylor* v. *Salmon,* 4 M. & C. 134, 18 Eng. Ch. R.; *Walworth* v. *Holt,* 4 M. & C. 18 Eng. Ch. R. 619; *Small* v. *Atwood,* 1 Younge's R. 407; *Chancey* v. *May,* Prec. in Ch. Finch's Chan. Cas. 592.)   There are many English and American cases of like character.   Those already adverted to sufficiently show the nature of the exceptions which obtained in chancery to the general rule in regard to parties, the principle upon which they were based, and the manner of their practical application.   The rule, and its exceptions, in their breadth and substance, were adopted into our code (sections 4993, 5007, and 5008, Revised Stat-

utes) and by its provisions made applicable to the civil action which it substituted for what was theretofore known as the suit in equity, and the action at law. It is argued by counsel for the defendant in error that the provisions of section 5008, permitting one or more to sue or defend for the benefit of all, when the question is one of a general or common interest of many persons, or when the parties are very numerous and it is impracticable to bring them all before the court, apply only to actions of an equitable nature, because, before the code, that manner of proceeding was allowed only in suits in equity. If that were a sufficient reason for restricting the provisions of that section to such actions, the same reason would make it necessary to so restrict the general requirement of the code that the plaintiffs must be the real parties in interest, and all must join who are united in interest; for that, as we have seen, was the general rule in equity, and not applicable to many actions at law; and so, with respect to the rule adopted by the code, requiring the petition to state the facts constituting the cause of action, and others of its provisions. Indeed, the mode of procedure in the civil action is, in most respects, taken from, or assimilated to, that which prevailed in suits in chancery. One object of the code in abolishing the distinction between actions at law and suits in equity, and prescribing the same method of procedure for the prosecution of both, evidently was to simplify judicial proceedings, and facilitate the administration of justice; and to accomplish that end, its provisions, and proceedings under them, should receive that liberal construction which it is expressly required shall be given them. To restrain the application of section 5008 to actions of a purely equitable nature would, we think, be at variance with its language, and the general spirit and purpose of the code."

We are not called upon in considering the motion and order in this proceeding to determine whether the manner in which plaintiff has made the organizations in question defendants is subject to objection. If there is a defect or misjoinder of parties defendant, that question should have been raised by demurrer (Comp. Laws, 3135), and plaintiff given an oppor-

tunity to amend. Wherever a pleading is defective, which defect may be cured by amendment, and such defect may be taken advantage of by demurrer, that course should be adopted. In discussing a similar question, this court, in *Treadway* v. *Wilder*, 8 Nev. 97, after saying that upon demurrer the pleading would have been bad, but the defect could have been remedied by amendment, said: "No such opportunity was given, and a technical judgment may have cut off a substantial right; such is not the spirit of the code, nor, when properly interpreted, its practice." Section 71 of our practice act provides: "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings, which shall not affect the substantial rights of the parties; and no judgment shall be reversed or affected by reason of such error or defect." (Comp. Laws, 3166.) We think, as the court did not and could not grant the relief demanded in the motion, it should have denied it *in toto*, leaving respondents to whatever remedy they may have been entitled by demurrer.

2. It appears from the order of the lower court that the attachment was only dissolved as against the voluntary unincorporated associations designated by name in the complaint, but as to the natural persons therein named it was not dissolved. From this it would appear that the trial court did not consider the writ as against the natural persons defendant to have been improvidently issued, and in this view the trial court was clearly correct. What we have said in reference to the voluntary associations as parties defendant applies with equal force to the order dismissing the attachment as to them. If the attachment is good as against any defendants, it is good as to all.

It is contended by counsel for respondents that the affidavit fails to sufficiently charge that the alleged obligation of defendants to pay damages to plaintiff was criminally incurred. The affidavit charges such liability in the language of the statute (Comp. Laws, 3218), and, in addition, makes the complaint with its allegations a part of the affidavit. It is unnecessary for us to determine whether a bare allegation in the language of the statute would be sufficient, where, as in this

case, the facts upon which the damage is alleged to have been occasioned are fully set forth. If these alleged facts in themselves state a case that would be criminal, then the affidavit is unquestionably sufficient. There can be no question that a criminal conspiracy is alleged in the affidavit under all the authorities. The law, upon one portion of the case as it appears from the affidavit, is concisely stated in 8 Cyc. 639, as follows: "Neither at common law nor under statutes modifying the common-law doctrine is it lawful for workmen to combine to injure another's business by causing his employees to leave his service by intimidation, threats, molestation, or coercion. Such a combination constitutes an indictable conspiracy."

Again, the same authority, in continuation of the same general topic, says: "This term (boycott) ordinarily means a confederation, generally secret, of many persons whose intent is to injure another, by preventing any and all persons from doing business with him through fear of incurring the displeasure, persecution, and vengeance of the conspirators. The character of agreement included in the term defined is highly unlawful and is an indictable conspiracy."

Such a conspiracy is made punishable both by fine and imprisonment under section 4751 of the Compiled Laws of Nevada.

See, also, Comp. Laws, 4788; *Loewe* v. *Lawlor*, 208 U. S. 274, 28 Sup. Ct. 301; 2 Wharton, Crim. Law, 2322; 2 Bishop, Crim. Law, 172; Desty, Crim. Law, 11; 3 Chit. Crim. Law, 1138; 2 Russell on Crimes, 674; McLain, Crim. Law, 955, 963; Clark's Crim. Law, 121; *Crump* v. *Commonwealth*, 84 Va. 927, 6 S. E. 620, 10 Am. St. Rep. 895; *State* v. *Donaldson*, 32 N. J. Law, 151, 90 Am. Dec. 649; *Smith* v. *People*, 25 Ill. 17, 76 Am. Dec. 783, and note; *State* v. *Stewart*, 59 Vt. 273, 9 Atl. 555, 59 Am. Rep. 710, and note, 720; *People* v. *Kostka*, 4 N. Y. Cr. Rep. 429; *Emack* v. *Kane*, 34 Fed. 47; *Hopkins* v. *Oxley Stave Co.*, 83 Fed. 912, 28 C. C. A. 99; *State* v. *Glidden*, 55 Conn. 46, 8 Atl. 890, 3 Am. St. Rep. 23; *Rex* v. *Eccles*, 1 Leach, 274; *Steamship Co.* v. *McGregor*, 15 Q. B. Div. 476; *Regina* v. *Druitt*, 10 Cox, C. C. 592.

Many other cases, both English and American, state and

federal, might be cited, but the foregoing are sufficient upon a question upon which there is little, if any, conflict of authority.    Many decisions of a kindred nature, not criminal in their procedure, but in which the unlawfulness of certain conspiracies, considered with special reference to civil liability, may be found reviewed in the recent opinion of Farrington, J., in the case of the *Goldfield Consolidated Mines Co.* v. *Goldfield Miners' Union No. 220, et al.* (C. C.) 159 Fed. 500.

In this case Judge Farrington, in referring to the rights guaranteed to every citizen under section 1 of the fourteenth amendment to the Constitution of the United States (which is as follows: "Nor shall any state deprive any person of life, liberty or property without due process of law, nor deny any person within its jurisdiction the equal protection of the laws") and article I, section 8, of the Constitution of Nevada (which contains a similar provision as follows: "No person shall be * * * deprived of life, liberty, or property without due process of law"), very appropriately and correctly said and quoted: "The terms 'life, liberty, and property,' as used in the Federal Constitution, embrace every right which the law protects.    They include not only the right to hold and enjoy, but also the means of holding, enjoying, acquiring, and disposing of property.    The right to labor is property.    It is one of the most valuable and fundamental of rights.    The right to work is the right to earn one's subsistence, to live and to support wife and family.    The right of master and servant to enter into contracts, to agree upon the terms and conditions under which the one will employ and the other will labor, is property.    The master has the right to fix the terms and conditions upon which he is willing to give employment; the servant has the right to fix the terms and conditions upon which he is willing to labor, and any statute which curtails and limits that right deprives the party affected of his property, and, in the same measure, of his liberty.    Both parties are free to enter into, or refuse to enter into, the contract.    Before the law, there is the same freedom to employ as to work, to buy as to sell, to choose one's employee as to choose one's employer.    'The liberty of contracting, relating to labor, includes both parties;

the one has as much right to purchase as the other to sell labor.' (*Allgeyer* v. *Louisiana*, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832; *Lochner* v.' *New York*, 198 U. S. 45, 56, 25 Sup. Ct. 539, 49 L. Ed. 937.) 'One citizen cannot be compelled to give employment to another, nor can any one be compelled to be employed against his will.' (*Gillespie* v. *The People*, 188 Ill. 176, 58 N. E. 1007, 52 L. R. A. 283, 80 Am. St. Rep. 176.) The right of an employer to refuse to employ any particular individual, or any class of individuals, is neither greater nor less than the right of a man to refuse to work for any particular individual, or class of individuals. The reason for the refusal can in no wise control, enlarge, or diminish the legal right of refusal, the right to employ, or the right to refuse to be employed. 'It is a part of every man's civil right that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with any one with whom he can make contracts. (2 Cooley on Torts, 587.)' "

In *Ex Parte Boyce*, 27 Nev. 229, 75 Pac. 1, 65 L. R. A. 47, we said: "Labor properly directed creates wealth, and all honest toil is noble and commendable. The right to acquire and hold property guaranteed by our Constitution is one of the most essential for the existence and happiness of man, and for our purposes here we may consider it to be the cornerstone in the temple of our liberties, and that it implies and includes the right to labor. It may also be granted that labor, the poor man's patrimony, the creator of wealth, and upon which all must depend for sustenance, is the highest species of property, and the right to toil is as sacred and secure as the millions of the wealthy; but individual rights, however great, are subject to certain limitations necessary for the good of others and the community, and inherent in every well-regulated government. * * * Broadly speaking, the right to acquire and hold property, which presupposes the one to labor at all ordinary pursuits, is subordinate to this greater obligation not to injure others, individually

or collectively, and to contribute and aid in the support of the government in all its legitimate objects."

It necessarily follows that any attempt by conspiracy to interfere with these fundamental and essential rights or by threats, intimidation, and violence, to prevent the employer from hiring or the employee from laboring, is unlawful under our system of government by which all men are free and equal. No organization or combination of men or individuals can lawfully prevent the exercise of these constitutional rights by all others. If it were legal for the defendant organizations or the officers and members by force, threats or intimidation to prevent the employees of plaintiff from continuing in their employment, it would be equally so for the unions to which plaintiff's employees belong and for owners' and operators' associations or for other organizations or the officers and members thereof by force, threats, or violence to prevent the members of the defendant organizations from working, even to the extent of starvation. As the law bears equally upon all, it is self-evident that if any labor union or organization could by threats, force, and intimidation lawfully prevent the members of any other union or organization from laboring for employers, or could by force, threats, and intimidation prevent employers from hiring members of other unions or organizations, that every other union or organization would have the same and equal right, resulting eventually in control by the organization exercising the most force and violence, and in the overthrow and subversion of law and order.

In the case of *Hopkins* v. *Oxley Stave Co.*, *supra*, cited and quoted from by counsel for respondents in his brief, the court says: "While the courts have invariably upheld the right of individuals to form labor organizations for the protection of the interests of the laboring classes, and have denied the power to enjoin the members of such associations from withdrawing peaceably from any service, either singly or in a body, even where such withdrawal involves a breach of contract (*Arthur* v. *Oakes*, 11 C. C. A. 209, 63 Fed. 310, 25 L. R. A. 414), yet they have very generally condemned those combinations usually termed 'boycotts,' which are formed

for the purpose of interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them, by means of threats and intimidation, of the right to conduct the business in which they happen to be engaged according to the dictates of their own judgments. The right of an individual to carry on his business as he sees fit, and to use such implements or processes of manufacture as he desires to use, provided he follows a lawful avocation and conducts it in a lawful manner, is entitled to as much consideration as his other personal rights; and the law should afford protection against the efforts of powerful combinations to rob him of that right and coerce his will by intimidating his customers and destroying his patronage. A conspiracy to compel a manufacturer to abandon the use of a valuable invention bears no resemblance to a combination among laborers to withdraw from a given employment as a means of obtaining better pay. Persons engaged in any service have the power, with which a court of equity will not interfere by injunction, to abandon that service, either singly or in a body, if the wages paid or the conditions of employment are not satisfactory; but they have no right to dictate to an employer what kind of implements he shall use, or whom he shall employ. Many courts of the highest character and ability have held that a combination such as the one in question is admitted to have been is an unlawful conspiracy, at common law, and that an action will lie to recover the damages which one has sustained as the direct result of such a conspiracy."

Referring to the section of the crimes and punishments act of Nevada relative to conspiracy, counsel for respondents in his brief says: "The conspiracy statute, which was but declaratory of the common law, was amended in 1887, Compiled Laws, 4751, and provides: 'That no part of this act shall be construed in any court of this state to restrict or prohibit the orderly and peaceably assembling or coöperation of persons employed in any profession, trade or handicraft for the purpose of securing an advance in the rate of wages, or compensation, or for the maintenance of the same.' * * * Whether the means by which labor combinations seek to effect

its objects and purposes is criminal or not depends upon the lawfulness of the mode or action taken in and by which injury is inflicted or threatened—that is, whether it is an actionable wrong or is merely such as the law denominates *damnum absque injuria.*"

According to the complaint and affidavit in this case, the defendants are not within the provisions of the amendment of the statute in any sense whatever. No question of an advance in the rate of wages paid employees, or the maintenance of the same, is here involved. Upon the contrary, the complaint alleges that plaintiff was employing "union" men and paying "union" wages. So far as the complaint now before the court is concerned, it appears that both the plaintiff and his employees were entirely satisfied with existing conditions. The damage alleged in this case to have been sustained was not caused by the employees of plaintiff seeking by peaceable means to maintain or better their condition, but by outsiders, who are alleged to have demanded of plaintiff that he compel his employees to become members of what would appear to be a rival labor organization, and, upon his refusal, entered into the conspiracy charged, to compel him to accede to their demands, or they would ruin his business. Nor is it charged even that defendants were seeking to accomplish their declared purpose by "orderly and peaceably assembling or coöperation"; but, upon the contrary, by means of intimidation, threats of violence and actual violence. Counsel for respondents has not cited us an authority, nor do we think one can be found, holding that what defendants are charged in the complaint with having conspired to accomplish by resorting to intimidation and acts of violence, did not state facts which constitute crime.

It is not necessary that all of the acts alleged to have been committed in pursuance of the conspiracy charged be, in themselves, of a criminal nature; and it is unnecessary to determine whether each and every specific act alleged is unlawful. Some of the acts charged are known by all men to be unlawful, and when they are performed as a part of the means to carry out the purpose which the complaint alleges

the defendants combined to accomplish, a conspiracy, criminal in its nature, is sufficiently charged, at least for the purposes of an affidavit for attachment.

Counsel for respondents in his brief says that the return of the sheriff shows that certain property was wrongfully attached under the writ. No question of that kind is presented in the record, and could not be upon the orders appealed from. If the sheriff has taken under his charge property not subject to attachment, the statute affords an appropriate and only remedy.

The briefs in this case have covered a much wider scope than the questions involved upon the record, and a considerable discussion has been indulged in, based upon the law controlling under a state of facts different from those alleged in plaintiff's complaint. We are governed in the law of this case by what is alleged to exist, not by some other state of facts which a trial may subsequently develop. It would, therefore, be of no value as a precedent, and of little other value, to enter upon a purely academic discussion of questions not now before the court.

In considering the order of the district court, similarly as questions upon demurrer, the charges and allegations of the complaint are assumed to be true for the purposes of the appeal, to the end that plaintiff may have an opportunity to present proof, but whether the defendants did in fact commit the unlawful acts charged by the complaint or not, remains to be determined upon the trial, and by a jury, if any of the parties desire one, after defendants have been given an opportunity to make denial or answer setting up any defense they may have, and all parties have presented their evidence and been heard.

For the reasons given, the orders appealed from are reversed, and the cause is remanded for further proceedings.